10 P.3d 452 (2000)
102 Wash.App. 795
Kirk ROBINSON; Jean Robinson; Patricia Carlisle; Oscar Eason, Jr.; Karen Jensen; John Junker; Don Moreland; Charles Royer; and The American Civil Liberties Union Of Washington, Taxpayers, Appellants,
v.
The CITY OF SEATTLE, a municipal corporation, Respondent.
No. 45511-7-I.
Court of Appeals of Washington, Division 1.
October 2, 2000.
*455 Michael E. Kipling, Stokes Eitelbach & Lawrence, P.S.; Laura J. Buckland, Seattle, for appellants.
Frederick E. Wollett, Seattle, for Respondent. *453
*454 ELLINGTON, J.
The City of Seattle requires a preemployment urinalysis drug test for about half the vacancies filled by the City. Appellants here ("the Taxpayers") challenge the constitutionality of this program. Because the testing constitutes a warrantless search without particularized grounds for suspicion, the City must show the program is narrowly drawn to achieve a compelling governmental interest. The program meets this standard only in part, and therefore violates article I, section 7 of the Washington State Constitution. We reverse the trial court's dismissal of the challenge and remand for a determination as to what City positions directly and genuinely implicate the safety of the public, and for entry of an order enjoining the program as applied to other positions.

FACTS
Seattle's Drug Testing Program
The present version of Seattle's program is not the first. In 1995, in response to federal transportation regulations, the City began requiring drug tests of applicants and employees in all positions requiring commercial driver's licenses (the "CDL program").
In 1996, the City implemented a mandatory, city-wide preemployment drug testing program requiring successful external applicants for all positions to undergo urinalysis drug testing.
On November 24, 1997, the City Council narrowed the preemployment testing requirement to applicants for positions in seven categories. On December 7, 1998, the City further narrowed the program to limit testing to "positions for which the job duties include: 1) public safety responsibilities; 2) handling dangerous substances; 3) hazardous physical activities; 4) routine operation of motor vehicles, heavy equipment, or power tools; and 5) routine performance of other safety-sensitive activities."[1] This is the program that was litigated here.
The City Council adopted findings and a 600-page legislative record. The findings make several points, which we briefly summarize. First, most illicit drug users are employed, and drug use occurs in all work places, including the City. Second, drug *456 abuse results in substantial loss to the national and local economies by way of lost productivity, absenteeism, turnover costs, health care costs, increased workplace accidents and injuries, more workers' compensation claims, and losses from impaired judgment and creativity. Third, preemployment drug testing is widely used in the private and public sectors, and if the City does not test applicants it may become a "last resort employer" for persons with substance abuse problems. Fourth, means for identifying drug abuse problems among incumbent employees (such as on-the-job observation) are not available for the population of non-incumbent applicants. Finally, statistics demonstrate the success of preemployment testing programs (including previous versions of the City's program) in reducing the number of incumbent employees with drug problems.
The findings state, "the City of Seattle has an overriding interest in selecting employees who are both healthy and free of substance abuse behaviors that could affect their ability to work safely and efficiently.... The City is committed to hiring efficient, productive, and safe employees to serve the citizens of Seattle, and pre-employment drug testing is a reasonable and effective tool for the City to use in pursuit of this goal."
Procedure for Determining Which Positions Require Urinalysis
The five categories set forth in the ordinance are obviously broad. They are not further defined in the ordinance. Insofar as we can discern from the briefing and record, the mechanics of the program are as follows. The program is implemented by the City's Executive Services Department (ESD), which is required by the ordinance to develop guidelines[2] for use by department heads, who decide whether to require a test.
The determination to require a drug test is based on the workers' compensation code assigned to the position, because according to the ESD, the codes "correlate closely with the risks of job related accidents and injuries." Six codes are used: (1) Public assistance employees-summer youth; (2) field; (3) electrical; (4) fire; (5) office; and (6) police. Applicants for electrical, fire, and police positions are automatically tested. The category "public assistance employees-summer youth" includes Conservation Corp members and work training enrollees, who are to be tested.[3]
*457 For field and office positions, each department head determines whether to test by comparing the duties of the position with the five categories and the guidelines. If the duties of the employee will include any of those in the five categories (e.g., handling dangerous substances or lifting 25 pounds), a drug test is required. There is no procedure for review of these determinations.
Applicants are informed of the possibility of a test requirement by means of job announcements. The urine sample must be provided at a designated medical facility within 12 hours of a conditional job offer. The record is unclear as to whether and how the giving of the sample is monitored. Applicants whose test is positive are asked to disclose any medical condition or treatment that may have affected the test results. Unexplained positive results cause disqualification from city employment for 12 months. The City maintains a database of such applicants for a period of five years.
Several thousand applicants have been tested since inception of the program. Approximately five to six percent tested positive. Between December 1, 1997 and June 30, 1998, positions for which testing was required under the current program included, among others: accountant, administrative support assistant, attorney, carpenter, cashier, civil engineering specialist, computer operator, counselor, golf course technician, librarian, life guard, metal fabricator, meter reader, personnel specialist, plumber, public relations specialist, recreation attendant, seasonal laborer (parks), security officer, tennis instructor, usher, and water laboratory assistant.
Procedural History
Appellants are eight residents of the City of Seattle and a non-profit corporation, the American Civil Liberties Union of Washington (ACLU), who pay local sales and use taxes ("the Taxpayers"). None of the Taxpayers claims to have applied to the City for employment.
In superior court, both parties moved for summary judgment. The trial court granted the City's motion. The Supreme Court denied direct review.

DISCUSSION
This court reviews an order granting summary judgment de novo.[4] Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[5] The facts and all reasonable inferences therefrom are considered in the light most favorable to the nonmoving party.[6]
We presume that regularly enacted ordinances are constitutional, unless the ordinance involves a fundamental right or suspect class, in which case the presumption is reversed.[7]
Standing
Washington recognizes "litigant standing to challenge governmental acts on the basis of status as a taxpayer."[8] Under the doctrine of taxpayer standing, "a taxpayer need not allege a personal stake in the matter, but may bring a claim on behalf of all taxpayers[.]"[9] Taxpayers need not allege a direct, special, or pecuniary interest in the outcome of the suit, but must demonstrate that their demand to the Attorney General to institute the action was refused, unless such a request would have been useless.[10]
*458 The Taxpayers assert their standing under this doctrine, and the City makes no argument to the contrary.[11] We agree that the Taxpayers have standing.[12]
Test for Constitutionality under Taxpayer Challenge
The first question presented is what test applies when a taxpayer challenges the constitutionality of an enactment. The City argues that because a taxpayer challenge is a facial challenge, the Taxpayers here must satisfy the standard set forth in United States v. Salerno[13] for facial attacks in First Amendment casesthat is, the Taxpayers must prove "that no set of circumstances exists under which the Act would be valid." According to the City, the Taxpayers' concession[14] that the ordinance is constitutional when applied to police officers or firefighters is fatal to their challenge to the remainder of the ordinance.
It is true that the Taxpayers' challenge is inherently "facial," because the inquiry is not whether application of the challenged enactment violates a particular individual's rights, but whether the government has acted unlawfully. It is also true, as the Taxpayers point out, that no Washington court has applied the Salerno test to a taxpayer suit.[15] More importantly, Washington courts have not employed the Salerno test for any facial challenges, and it has little vitality elsewhere. Our review persuades us that Salerno is not the appropriate test for taxpayer challenges in Washington.
First, the test has not been followed by the United States Supreme Court,[16] which recently referred to the Salerno test as "dictum," and observed: "To the extent we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision of this Court[.]"[17] Justice Stevens has characterized the Salerno *459 test as a "rhetorical flourish ... unsupported by citation or precedent."[18]
Several state courts have rejected application of the Salerno test. After an exhaustive review of unfavorable treatment of Salerno by the U.S. Supreme Court and federal courts of appeals, the New Mexico Supreme Court declined to apply the Salerno test in a facial challenge to a tax statute.[19] The Minnesota Supreme Court did the same.[20] The California Supreme Court decided a taxpayer challenge to a city's employment drug testing program without applyingor mentioningthe "no set of circumstances" test in its analysis of either the Fourth Amendment or its state constitution.[21]
Second, the City does not explain how the Salerno test would apply here, except to assert that because the Taxpayers do not challenge the testing program for law enforcement and fire safety applicants, the Taxpayers cannot establish that there is no set of circumstances in which the ordinance is valid. But the ordinance itself creates five categories, only one of which is "public safety responsibilities." The City does not explain why a facial challenge is not available to other aspects of the ordinance, even under Salerno.
Third, the City does not explain why the Salerno test should be applied to a state court challenge, particularly a challenge under the state constitution. In City of Chicago v. Morales,[22] the U.S. Supreme Court clarified that Salerno does not require a party mounting a facial challenge in state court to establish that no set of circumstances exists under which the challenged statute would be valid: "We need not, however, resolve the viability of Salerno's dictum, because this case comes to us from a statenot a federalcourt.... Whether or not it would be appropriate for federal courts to apply the Salerno standard in some casesa proposition which is doubtfulstate courts need not apply prudential notions of standing created by this Court."[23] Finally, the City cites no case in which our courts have applied the "no set of circumstances" test, and we find none.[24]
We thus reject the Salerno "no set of circumstances" test as inappropriate for a taxpayer challenge under the state constitution. Instead, we will apply the test dictated by the nature of the challenge.
Article I, Section 7 of the Washington State Constitution
The Taxpayers challenge the City's preemployment drug testing program under both the Fourth Amendment and article I, section 7 of the state constitution. When a challenge is made under both constitutions, we first consider the state constitution.[25]
Article I, section 7 of the Washington State Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Only governmental intrusion into individual privacy falls within this prohibition.[26] Our *460 Supreme Court has held that article I, section 7 "`clearly recognizes an individual's right to privacy with no express limitations'" and places greater emphasis on privacy than does the Fourth Amendment.[27]
The Taxpayers argue that article I, section 7 of the state constitution affords greater protection in the context of preemployment drug testing than does the Fourth Amendment. In support of this argument, the Taxpayers submit an analysis of the Gunwall factors.[28] The City makes no response to the Taxpayers' Gunwall analysis, and thus appears to concede that article I, section 7 provides greater protection in this context. Because no court has previously considered whether article I, section 7 affords greater protection than the Fourth Amendment in the context of preemployment drug testing, however, we conduct our own review of the Gunwall factors.[29]
The six nonexclusive factors for determining whether a state provision provides more protection than its federal counterpart are: (1) the textual language, (2) significant differences in the texts; (3) state constitutional and common law history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state interest or local concern.[30] Because the Gunwall court compared the same constitutional provision as that invoked here, we adopt its analysis of the first, second, third, and fifth factors.[31] Analysis of these factors generally remains the same each time a constitutional provision is examined.[32] We examine the fourth and sixth factors because they tend to be unique to the context in which the issue arises.[33]
The fourth factor requires an examination of preexisting state law to determine what protection this state has historically afforded the subject at issue.[34] The Taxpayers simply comment that while drug testing was not an issue when the state constitution was adopted, warrantless and otherwise arbitrary searches and seizures were explicitly prohibited in the Washington Territory. The Gunwall and other courts' analyses demonstrate, however, that "preexisting state law" is a broader inquiry than merely a glance back at the last century.[35] Thus, the extent to which Washington law has protected the privacy of the body and bodily functions, or the privacy of job applicants and employees, is relevant to this inquiry.
While our review of this subject is not exhaustive, we conclude that preexisting state law reflects a consistent protection of privacy of the body and bodily functions. For example, the right to privacy in Washington includes "the freedom of choice to refuse electroconvulsive therapy, to decline medical treatment in certain instances and to oppose blood tests in certain instances."[36] No person is subject to HIV testing without consent, with few exceptions.[37] The results of a urinalysis test taken at the direction of a patient's physician constitute a private communication within the meaning of the physician-patient privilege.[38]
Further, the area within an occupied toilet stall is characterizedas as "private" for purposes *461 of article I, section 7.[39] An enclosed toilet stall is an area in which a person has both a subjectively and an objectively reasonable expectation of privacy such that an officer's act of looking into an enclosed toilet stall constitutes a search under article I, section 7.[40]
As to privacy of employees, employer-employee relations tend to be heavily regulated, and a history of state regulation provides support for independent state constitutional analysis.[41] Many such provisions regulate in the area of privacy. For example, public and private employers are (with few exceptions) prohibited from requiring lie detector tests as a condition of employment or continued employment.[42] Washington has historically and extensively protected the health and safety of employees, including a constitutional mandate to protect persons working in dangerous places.[43] This state also has protected government employees' collective bargaining rights.[44]
The privacy protections afforded in Washington to the body and bodily functions, and the long history of this state's regulation of the employer-employee relationship, support independent state constitutional analysis.
The sixth Gunwall factor is whether the matter at hand is of particular state interest, or there appears to be a need for national uniformity.[45] At least one state court has already ruled on the constitutionality of preemployment drug testing under its state constitution.[46] Certainly there appears no need for national uniformity in the matter of how each state's government conducts its hiring practices. Thus, the sixth factor also supports an independent analysis under the state constitution.
We conclude that the Gunwall factors justify an independent analysis under article I, section 7.
Article I, section 7 "breaks down into two basic components: the disturbance of a person's `private affairs' or the invasion of his or her home, which triggers the protection of the section; and the requirement that `authority of law' justify the governmental disturbance or invasion."[47] Disturbance of private affairs occurs when the government intrudes upon those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass.[48]
The ultimate inquiry is whether the government has unreasonably intruded into a person's private affairs.[49]
The collection and testing urine by the City no doubt constitutes a search[50] and therefore implicates article I, *462 section 7.[51] As such, the search must be conducted pursuant to constitutionally sufficient authority of lawthat is, a valid warrant or the common law; a statute or ordinance that authorizes an unconstitutional search does not satisfy the "authority of law" requirement.[52] To pass constitutional muster, the City's warrantless drug testing program must fall within a common law exception.
Historically recognized common law exceptions[53] to the warrant requirement under the state constitution include exigent circumstances, consent, searches incident to a valid arrest, inventory searches, the plain view doctrine, and Terry[54] investigative stops.[55] Other exceptions include airport and courthouse searches.[56] A warrantless search that falls outside these "jealously and carefully drawn exceptions" to the warrant requirement is per se unreasonable.[57] The government has the burden of showing that a search falls within an exception to the warrant requirement.[58]
Our court has repeatedly struck down exploratory searches that fall within no recognized exception to the warrant requirement. For example, in City of Seattle v. Mesiani,[59] the Supreme Court considered the random roadblock sobriety checkpoint program initiated by Seattle police. The Court characterized the program as a "highly intrusive" search, and held it violated "the right to not be disturbed in one's private affairs guaranteed by article I, section 7...."[60]
In Kuehn v. Renton School District,[61] the Supreme Court held that a search of students' luggage required by school officials as a condition of participation in a school-sponsored trip to Canada violated both the Fourth Amendment and article I, section 7.[62] The Court enunciated the constitutional principles in strong, unequivocal language: "In the absence of individualized suspicion of wrongdoing, the search is a general search. `We never authorize general, exploratory searches.'"[63] The Court concluded: "The general search is anathema to Fourth Amendment and Const. art. 1, § 7 protections, and except for the most compelling situations, should not be countenanced."[64]
In Jacobsen v. City of Seattle,[65] the Court was asked whether warrantless patdown searches could be conducted as a condition of *463 admission to rock concerts at the Seattle Center Coliseum. The search requirement was motivated by disruptions at various concerts, and police began to search for alcohol, explosive devices, weapons, and objects that could be thrown. The Supreme Court held the searches violated the Fourth Amendment.[66] The Court acknowledged the legitimate basis for the City's concerns, but nonetheless rejected the City's argument that such searches are analogous to warrantless searches at courthouses and airports. The Court observed that unruly patrons at the Coliseum pose substantially less danger than aircraft hijackers or terrorist bombers,[67] and contrasted the "highly intensive patdown searches" to the less intrusive airport magnetometer searches and courtroom visual inspections of packages and briefcases.[68]
Our Supreme Court has thus not been easily persuaded that a search without individualized suspicion can pass constitutional muster. The City argues, however, that the search is justified under article I, section 7 by the same analysis that would apply under the Fourth Amendment. For analysis of searches outside the criminal investigation context, the U.S. Supreme Court created the "special needs" exception to the Fourth Amendment warrant requirement: "[P]articularized exceptions to the main rule [that a search be based on individualized' suspicion of wrongdoing] are sometimes warranted based on `special needs, beyond the normal need for law enforcement.'"[69]
When the government justifies a Fourth Amendment intrusion based on "special needs," i.e., concerns other than crime detection, "courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties."[70] Under a federal special needs analysis of employee drug testing, "the proffered special need for drug testing must be substantialimportant enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion."[71] A need is vital enough to suppress the normal requirement of individualized suspicion where a warrant or probable cause requirement would place the government's interest "in jeopardy."[72] Where "public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged."[73]
Although the special needs analysis appears to be an established part of Fourth *464 Amendment jurisprudence,[74] the Washington Supreme Court has developed a different approach for article I, section 7 analysis of governmental searches outside the context of law enforcement. In State v. Farmer,[75] the court considered whether a court order requiring a criminal defendant to be tested for HIV violated his fundamental right to privacy. The Court noted that the right may be justifiably limited by a narrowly drawn, compelling state interest, and identified four such interests: preservation of life, protection of innocent third parties, prevention of suicide, and protection of the ethical integrity of the medical profession.[76] The Court held the order in Farmer satisfied none of these interests.[77]
In In re Juveniles A, B, C, D, E,[78] the Supreme Court considered a statute mandating HIV testing for juvenile sex offenders. The Court engaged in a special needs analysis for the Fourth Amendment challenge, but applied an entirely different analysis with respect to article I, section 7.[79] Discussing the test to be applied under the state constitution, the Court commented:
We have recognized two types of privacy: the right to nondisclosure of intimate personal information or confidentiality, and the right to autonomous decision-making. The former may be compromised when the State has a rational basis for doing so, while the latter may only be infringed when the State acts with a narrowly tailored compelling state interest.[80]
The Court held that "[t]he nonconsensual taking of blood implicates the personal autonomy branch of privacy," thus requiring the State to show both a compelling interest and a statute narrowly tailored to achieve that interest.[81] In upholding the statute, the Court found the State had compelling interests in protecting public health from the spread of AIDS, in promoting treatment of victims who have been exposed to AIDS, and in alerting prison officials of the needs to ensure that the virus is not spread to others and that treatment and counseling are available to protect the offender and future victims.[82]
The City's preemployment drug test requirement is a search that implicates both the confidentiality and the personal autonomy branches of privacy under article I, section 7.[83] The autonomy test therefore applies here. The search must be justified by compelling governmental interests and must be narrowly tailored to meet those interests.
The City does not offer a compelling interest argument, but confines itself to one paragraph arguing that "the search called for by the ordinance does not infringe upon any privacy interest protected by article one, section seven." The City contends that its program satisfies the Fourth Amendment "special needs" test because of the City's special need to avoid hiring drug abusing applicants in "safety-sensitive" jobs. Without offering analysis, the City then asserts that "nothing *465 in the Washington Constitution justifies a different result."
This approach is unhelpful. Whether or not the special needs test is satisfied does not answer the question presented under article I, section 7. Rather, we first consider whether the privacy interest intruded upon is one that citizens have held and should be entitled to hold safe from governmental trespass, and then whether a compelling interest, achieved through narrowly tailored means, supports the intrusion.
a. Privacy Interest
It is difficult to imagine an affair more private than the passing of urine. As the U.S. Supreme Court observed, "`Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.'"[84] The Court held that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable.[85] The protections of article I, section 7 are never less than those of the Fourth amendment.[86] There is thus no doubt that the privacy interest in the body and bodily functions is one Washington citizens have held, and should be entitled to hold, safe from governmental trespass.
The City makes several arguments in an attempt to diminish both the expectations of privacy of government job applicants and the degree of intrusion represented by the testing. First, the City alleges "today's reasonable expectation of privacy" is substantially lowered as a result of widespread drug abuse and the necessities of its detection. While this argument finds support in some Fourth Amendment cases,[87] the rule is otherwise under the state constitution:
[W]hile the Fourth Amendment operates on a downward ratcheting mechanism of diminishing expectations of privacy, article I, section 7, holds the line by pegging the constitutional standard to "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant."[88]
The City also alleges that both the applicants' expectation of privacy, and the degree of the City's intrusion on that expectation, were diminished because 299 of the 976 applicants tested in the first 10 months of 1998 also were required to submit to a general physical examination, and an additional 59 were required to complete a medical questionnaire. The City relies on Loder v. City of Glendale,[89] where a divided California Supreme Court considered a city's requirement for drug testing of all applicants, and found the program constitutional under both the Fourth Amendment special needs analysis[90] and the California constitution.
The Loder court relied heavily on the fact that all applicants were required to undergo a "lawful medical examination," and concluded that the program resulted in a significantly lesser degree of intrusion than would otherwise occur.[91] This reasoning is not *466 persuasive here. Even if a general medical examination requirement actually lessens the degree of the intrusionwhich we doubt the City does not suggest how this argument justifies testing the other 677 applicants.[92]
Finally, the City relies on an impertinent statement by the Sixth Circuit: "Anybody who has stood in line in men's room urinals at sports stadiums, public arenas, theaters or public bars understands that the act of urination is not always an altogether private one."[93] No doubt the City is aware that many job applicants do not "stand in line in men's room urinals." In any event, the privacy afforded in football stadium restrooms is not the measure by which we judge whether the government may intrude.
Implicit in the City's arguments is the proposition that a citizen relinquishes fundamental rights by submitting an application for government employment.[94] Essentially, the City argues that the applicant who applies with knowledge of the test has no reasonable expectation of avoiding it and so in effect consents to it. While this proposition finds its way into Fourth Amendment case law,[95] our court has disapproved of the consent theory in several analogous contexts under article I, section 7.
In Kuehn v. Renton School District,[96] for example, the Court struck down previously announced searches of student luggage conducted by school officials as a condition of a voluntary school field trip. The Court rejected the notion that voluntary submission to the search renders it constitutional: "neither the voluntary nature of the activity nor the preannouncement of the search, standing alone, make the search constitutional."[97] In Jacobsen v. City of Seattle,[98] the Court held rock concert patrons could not constitutionally be subjected to a patdown search, and observed: "Parenthetically, we note that even if the consent issue had been raised by defendants it is extremely doubtful, given the circumstances of this case, that they could have prevailed."[99] Given the "special solicitude of article 1, section 7 for the privacy rights of individuals,"[100] we conclude an application for government employment does not constitute voluntary submission to an invasion of constitutional rights.
*467 We thus reject the City's attempts to minimize either the privacy interests invaded or the degree of the government's intrusion. The right of privacy is neither surrendered nor diminished by the submission of an application for government employment.
The privacy interest is a fundamental right,[101] and the City's intrusion on this right is significant.[102] Here, all of the citizens who apply for employment, 95 percent of whom are not drug users, must submit to a humiliating procedure in order for the City to learn the chemical content of their urine. If a roadblock is "highly intrusive" of privacy rights,[103] and if a patdown search at a rock concert is "highly intensive,"[104] then the highly invasive nature of a urinalysis requirement is patent.[105] The reasons for the invasion must be compelling.
b. Compelling Interest
We turn to whether the City has a compelling interest justifying its intrusion upon privacy. The test for a compelling interest is not some "fixed, minimum quantum of governmental concern," but rather whether the government's interest is sufficiently important (i.e., a "relatively high degree of government concern") to justify the particular invasion of the constitutional right in question.[106] "To constitute a compelling interest, the purpose must be a fundamental one and the legislation must bear a reasonable relation to the achievement of the purpose."[107] A "compelling interest" is "based in the necessities of national or community life such as clear threats to public health, peace, and welfare."[108]
Government can have few obligations greater than protection of the safety of its citizens; public safety is clearly a compelling interest that justifies intrusion on the autonomy branch of privacy under article I, section 7.[109] Suspicionless preemployment drug testing is therefore justified under article I, section 7 where the duties of a particular position genuinely implicate public safety, such that there is potential jeopardy to members of the public if such duties are performed by a person who abuses drugs.
The City describes its entire program as "narrowly restricted to outside applicants for vacancies in safety-sensitive positions[.]" Since half the City's jobs are deemed to fall in this "safety sensitive" category, however, this claim requires examination. The City says the identification of safety-sensitive jobs under the ESD guidelines "is reasonable because it is restricted to dangerous work involving public safety, use of electricity, life guarding, ... operating motor vehicles, heavy equipment, bridges and machinery and working with toxic substances." But the City is unable to explain what duties implicating public safety are performed by (for example) accountants or ushers or librarians or administrative assistants or public relations specialists.[110] Yet these *468 applicants are tested. Nor does the City explain why Conservation Corps members and work-training employees are tested regardless of their duties.
The City's program represents a breathtakingly broad concept as to what jobs implicate public safety. Ordinarily we give great deference to legislative determinations of this kind,[111] but here, neither the findings nor the legislative record supply a rationale.[112] As we have pointed out, the City bears the burden of justifying its programa burden it has thus far refused to shoulder. Where the City asserts that a warrantless, suspicionless search is reasonable because public safety is at stake, either the public safety implication must be obvious, or we must have more than bare assertions unsupported by record or argument.
The City's brief emphasizes the "safety sensitive" nature of all the jobs subject to testing, in an apparent effort to claim the mantle of public safety justification for the entire program. It is clear, however, that the City Council's concerns in enacting the program were considerably broader. The City Council found: "In light of the well documented problems that are associated with the abuse of drugs by employeesincreased absenteeism, diminished productivity, greater health costs, increased safety problems, potential liability to third parties and more frequent turnoverthe City has a legitimate interest in determining whether persons to be employed in any position currently are abusing drugs." Data from the CDL testing program were cited as evidence that "of the nine CDL employees testing positive for substance abuse, eight had current and prior workers' compensation claims... the average incurred cost of each employee in this group was $11,998 [compared to $6,272 for the other employees in the group]." The City found the testing program a reasonable method "for ensuring that the City maintains a safe working environment for its employees and provides to the public safe, productive, and efficient services."
There are no findings, however, related to safety problems or a safe working environment, other than those related to costs of compensation claims. The City's enumerated interests thus relate not to safety but to cost and efficiency. Important as these concerns are, cost and efficiency interests are not ordinarily considered compelling in the constitutional sense.
In an attempt to impart greater constitutional significance to its interests, the City points out that it acts here not in its sovereign capacity, but in its capacity as an employer. For First Amendment purposes, a governmental employer's interest in achieving its goals efficiently and effectively may indeed be elevated to permit certain restrictions on employee speech.[113] But neither the U.S. Supreme Court nor our Supreme Court has taken this approach for purposes of Fourth Amendment or article I, section 7 jurisprudence. The City makes no attempt to explain why policies justifying an elevated interest in First Amendment cases should apply here, and indeed, we think such a comparison would be difficult. The City also fails to address the fact that the U.S. Supreme Court has not considered the government's interest to be elevated when assessing the constitutionality of drug test searches of government employees.
We do not agree that the City's interest in cost or efficiency is constitutionally compelling. To begin with, cost alone has never been held to be a compelling interest justifying governmental intrusion upon a fundamental right.[114] Nor has efficiency:

*469 "The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972).[115]
The need to protect the "fragile values of a vulnerable citizenry" is acute, because governments' interests in cost and efficiency are all-encompassing. Virtually any intrusion could be justified if cost and efficiency were considered compelling interests in a constitutional sense. For example, police procedure would be vastly less costly and more efficient were it not for the constraints of the constitution.
Even if the City's interests in cost and efficiency could justify a suspicionless search, the City would also have to establish that it is without less intrusive alternatives to accomplish its objectives; otherwise, the search is unreasonable.[116] Public safety justifies a preemployment search because of the compelling need to know of drug problems before the public safety is placed in jeopardy for even one day. For these positions, the opportunities to observe and notice problems after an applicant is hired may come too late. The same proposition is not self evident, however, when the testing serves other interests.
We do not make light of the City's objectives. Reductions in absenteeism, sick leave, workers' compensation claims, disciplinary problems, and turnover are unimpeachable goals. In the eye of the constitution, however, efficiency and cost reduction are necessarily less important concerns than the safety of citizens. The City has failed to establish that its interests in efficiency and cost justify the exploratory searches here.
We thus find ourselves back where we started. The City has established no compelling interest for the testing program other than protection of public safety. Preemployment drug testing of applicants who will carry firearms or whose duties may otherwise jeopardize public safety is justified. What precise positions those may be is not readily apparent, beyond certain obvious police officer and firefighter positions. The program is therefore not narrowly drawn to achieve the only established compelling interest.

CONCLUSION
The national scourge of drug abuse is a proper and abiding concern for government. But even in the face of such concerns, the protections of the constitution control. Indeed, it is in the face of these concerns that we must most carefully guard against the government's abridgment of fundamental rights. As the Supreme Court expressed this duty in City of Seattle v. McCready,[117] "our decision must be governed by the enduring mandate of our state fundamental law *470 and not by the fluctuating demands of present expediency."
Under article I, section 7, the ultimate inquiry is whether the government has unreasonably intruded upon private affairs. In the reasonableness inquiry, the balancing of interest and intrusion is fact-specific. The City's preemployment drug testing program can satisfy article I, section 7 only to the extent it is narrowly tailored to achieve compelling governmental interests. That standard is satisfied only as to testing of City applicants whose duties will genuinely implicate public safety. On this record, we are unable to say which City positions fall within this category, other than sworn police officers and firefighters, and positions requiring an employee to carry a firearm.
We therefore reverse and remand for entry of an order enjoining the program as to all other positions. Upon further proceedings, to the extent the City is able to demonstrate that other City positions involve the performance of duties whereby public safety is in jeopardy, the trial court may modify its injunction as appropriate.
Reversed and remanded.
BAKER, J., and KENNEDY, J., concur.
NOTES
[1] City of Seattle, Ordinance 119278 (Dec. 7, 1998).
[2] The ESD prepared the following guidelines:

[P]ublic safety responsibilities
Includes sworn Police Officers, sworn Fire Fighters; and
Includes any other employee who exercises control over the safety of others, or who protects the public from injury and dangers, i.e., flagging traffic, performing traffic control, guarding school crossings, guarding property or providing personnel security.
[H]andling of dangerous substances
Dangerous substances include any chemical or material that is able or likely to inflict injury upon the user, including but not limited to solvents, flammable substances, toxic or poisonous substances, irritants, corrosives, oxidizers, as well as other substances such as lead, asbestos, all hazardous wastes, and biological hazards such as all human blood. Includes any substance that is included in the federally and state mandated hazard communication program. Excludes "office" employees who occasionally load copier and printer toner, even though toner technically falls under the hazard communication standard;
Handling is using, operating, managing, having access to, control over, or custody of.
[H]azardous physical activities
Hazardous physical activities include working with electricity (not plugging in a lamp), physically strenuous activity which is hazardous in the sense it could cause personal injury or injury to others from inattention or carelessness (e.g. lifting incorrectly, working at heights, materials handling).
Physically strenuous activity could be classified as "medium heavy" activity and above.
Medium-Heavy Activity Involves:
Lifting 50 to 75 lbs infrequently or
Lifting 25 to 35 lbs frequently, or
Walking/carrying at 3.5 mph on a level surface with 25 to 35 lb load.
[R]outine operation of motor vehicles, heavy equipment, or power tools
Routine is regular, commonplace procedure occurring at least weekly.
Motor vehicle includes a city vehicle or personal vehicle used in the course of employment.
[O]ther safety sensitive activities
Includes having access to computer systems or networks relating to public safety, such as the 911 center and the City's Emergency Operations Center.
[3] Applicants for high school internships and "Youth employment enrolleesummer youth" positions are not tested.
[4] Benjamin v. Washington State Bar Ass'n, 138 Wash.2d 506, 515, 980 P.2d 742 (1999).
[5] Soproni v. Polygon Apartment Partners, 137 Wash.2d 319, 325, 971 P.2d 500 (1999); CR 56(c).
[6] Soproni, 137 Wash.2d at 325, 971 P.2d 500.
[7] Weden v. San Juan County, 135 Wash.2d 678, 690, 958 P.2d 273 (1998).
[8] State ex rel. Boyles v. Whatcom County Super. Ct., 103 Wash.2d 610, 614, 694 P.2d 27 (1985).
[9] Walker v. Munro, 124 Wash.2d 402, 419-20, 879 P.2d 920 (1994); see also Kenneth R. Bjorge, Standing to Sue in the Public Interest: The Requirements to Challenge Statutes and Acts of Administrative Agencies in the State of Washington, 14 GONZAGA L.REV. 141, 155-61 (1978).
[10] City of Tacoma v. O'Brien, 85 Wash.2d 266, 269, 534 P.2d 114 (1975).
[11] Although the City listed lack of standing as an affirmative defense in its answer, the City did not argue lack of standing in its motion for summary judgment or in its brief on appeal.
[12] Neither party has discussed the Supreme Court's most recent taxpayer standing decision, Greater Harbor 2000 v. City of Seattle, 132 Wash.2d 267, 281, 937 P.2d 1082 (1997). The Court in Greater Harbor was badly divided on the issue of taxpayer standing, and the lead opinion, with two justices signing, states that taxpayer standing requires a showing of violation of a unique right. Greater Harbor, 132 Wash.2d at 281, 937 P.2d 1082. No other justices concurred on that issue, however, and it represents a departure from previous Supreme Court precedent. See Boyles, 103 Wash.2d at 613-15, 694 P.2d 27; O'Brien, 85 Wash.2d at 269, 534 P.2d 114. The lead opinion in Greater Harbor did not rely on its standing analysis for its result; the justices reached the merits despite their conclusion the taxpayers lacked standing. No other court has since adopted its analysis. We therefore follow the rule from previous cases, under which the Taxpayers here have standing. See State v. Gonzalez, 77 Wash.App. 479, 486, 891 P.2d 743 (1995) (plurality opinions "have only limited precedential weight and are not binding"); State v. Zakel, 61 Wash.App. 805, 808, 812 P.2d 512 (1991) ("Where there is no majority agreement as to the rationale for a decision, the holding of the court is the position taken by those concurring on the narrowest grounds.") (citing Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977)).
[13] 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).
[14] On appeal, the Taxpayers do not challenge application of the ordinance to "uniformed firefighters or police officers .... [or] to applicants for other City jobs in which employees are: (1) authorized to carry firearms; and (2) authorized by the City to discharge those firearms in the performance of their official duties." The Taxpayers also do not challenge the policy applied to holders of commercial driver's licenses.
[15] The importance of this observation is debatable; the only Washington case after Salerno involving a taxpayer's constitutional challenge was decided on grounds of mootness. See Boyles, 103 Wash.2d at 612, 694 P.2d 27.
[16] See Dorf, supra note 6, at 239 ("Not only does the Court inconsistently apply the broad Salerno principle, it fails to articulate why it departs from Salerno or to justify the extent of its departure."). For an interesting discussion of these issues, see Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 HARV. L.REV. 1321 (2000) and Matthew D. Adler, Rights, Rules, and the Structure of Constitutional Adjudication: A Response to Professor Fallon, 113 HARV. L.REV. 1371 (2000).
[17] City of Chicago v. Morales, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).
[18] Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 1175, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (mem.), denying cert. to 63 F.3d 1452 (8th Cir.1995).
[19] See Conoco, Inc. v. Taxation and Rev. Dep't of N.M., 122 N.M. 736, 931 P.2d 730, 736-38 (1996).
[20] See Caterpillar, Inc. v. Commissioner of Rev., 568 N.W.2d 695, 700 n. 8 (Minn.1997).
[21] See Loder v. City of Glendale, 14 Cal.4th 846, 59 Cal.Rptr.2d 696, 927 P.2d 1200, 1205, 1211-35 (1997).
[22] 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).
[23] Morales, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (responding to dissent).
[24] We find only two references in Washington cases to the Salerno "no set of circumstances" test. In one, a dissenting justice urged its application. See In re Detention of Campbell, 139 Wash.2d 341, 364, 986 P.2d 771 (1999) (Sanders, J., dissenting). In the other, the court found a statute constitutional as applied in the circumstances presented, and noted that under Salerno, this conclusion also amounted to a holding that the statute was facially constitutional. State v. Nelson, 81 Wash.App. 249, 256, 914 P.2d 97 (1996).
[25] State v. Johnson, 128 Wash.2d 431, 443, 909 P.2d 293 (1996).
[26] Roe v. Quality Trans. Servs., 67 Wash.App. 604, 608, 838 P.2d 128 (1992).
[27] State v. Ladson, 138 Wash.2d 343, 348, 979 P.2d 833 (1999) (quoting State v. Young, 123 Wash.2d 173, 180, 867 P.2d 593 (1994)).
[28] State v. Gunwall, 106 Wash.2d 54, 61-61 (1986).
[29] See Ladson, 138 Wash.2d at 348, 979 P.2d 833.
[30] Gunwall, 106 Wash.2d at 61-62, 720 P.2d 808.
[31] See e.g., State v. Boland, 115 Wash.2d 571, 576, 800 P.2d 1112 (1990); Johnson, 128 Wash.2d at 445, 909 P.2d 293.
[32] Johnson, 128 Wash.2d at 445, 909 P.2d 293.
[33] Johnson, 128 Wash.2d at 445, 909 P.2d 293.
[34] Gunwall, 106 Wash.2d at 61-62, 720 P.2d 808.
[35] See e.g., Gunwall, 106 Wash.2d at 66, 720 P.2d 808; Johnson, 128 Wash.2d at 445-46, 909 P.2d 293; Boland, 115 Wash.2d at 576, 800 P.2d 1112.
[36] State v. Farmer, 116 Wash.2d 414, 429, 805 P.2d 200 (1991).
[37] RCW 70.24.330.
[38] State v. Rochelle, 11 Wash.App. 887, 892, 527 P.2d 87 (1974).
[39] State v. Berber, 48 Wash.App. 583, 589, 740 P.2d 863 (1987).
[40] City of Tukwila v. Nalder, 53 Wash.App. 746, 749-52, 770 P.2d 670 (1989).
[41] See Johnson, 128 Wash.2d at 445-46, 909 P.2d 293 (long history of state regulation of travel provided strong support for independent state constitutional analysis of whether article I, section 7 provides greater protection of privacy in the sleeper of a tractor-trailer traveling on the highway).
[42] RCW 49.44.120.
[43] See Wash. Const. art. II, § 35; Gregory J. Duff, Editor's Preface: WISHA's Twentieth Anniversary (1973-1993), 17 U. PUGET SOUND L.REV. 243, 243 (1994).
[44] See, e.g., Washington State Bar Ass'n v. State, 125 Wash.2d 901, 914, 890 P.2d 1047 (1995) (Dolliver, J., dissenting); Zylstra v. Piva, 85 Wash.2d 743, 747-48, 539 P.2d 823 (1975).
[45] Gunwall, 106 Wash.2d at 62, 720 P.2d 808.
[46] See Loder v. City of Glendale, 14 Cal.4th 846, 59 Cal.Rptr.2d 696, 927 P.2d 1200 (1997).
[47] City of Seattle v. McCready, 123 Wash.2d 260, 270, 868 P.2d 134 (1994).
[48] McCready, 123 Wash.2d at 270, 868 P.2d 134.
[49] State v. White, 135 Wash.2d 761, 768, 958 P.2d 982 (1998).
[50] See Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (governmental employer's urinalysis drug test requirement constitutes search under Fourth Amendment); In re Juveniles A, B, C, D, E, 121 Wash.2d 80, 90, 847 P.2d 455 (1993) ("no doubt that the nonconsensual removal of blood constitutes Fourth Amendment search"); State v. Olivas, 122 Wash.2d 73, 83, 856 P.2d 1076 (1993) (blood test for DNA databank of violent and sex offenders constitutes search); State v. Meacham, 93 Wash.2d 735, 738, 612 P.2d 795 (1980) ("Court ordered blood tests are undoubtedly `searches' within the meaning of the constitution."); State v. Curran, 116 Wash.2d 174, 184, 804 P.2d 558 (1991) (nonconsensual blood test for suspected commission of vehicular homicide is a search), overruled on other grounds by State v. Berlin, 133 Wash.2d 541, 548, 947 P.2d 700 (1997).
[51] Young, 123 Wash.2d at 181, 867 P.2d 593.
[52] See Ladson, 138 Wash.2d at 350, 352 n. 3, 979 P.2d 833; In re Maxfield, 133 Wash.2d 332, 345-46, 945 P.2d 196 (1997) (Madsen, J., concurring); McCready, 123 Wash.2d at 272, 280 n. 11, 868 P.2d 134; Curran, 116 Wash.2d at 184-85, 804 P.2d 558.
[53] These recognized exceptions have also been called, "special circumstances," State v. Stroud, 106 Wash.2d 144, 148, 152, 720 P.2d 436 (1986), and "well-established principles of common law," Ladson, 138 Wash.2d at 350, 979 P.2d 833.
[54] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[55] Ladson, 138 Wash.2d at 349, 979 P.2d 833.
[56] See Jacobsen v. City of Seattle, 98 Wash.2d 668, 673-74, 658 P.2d 653 (1983).
[57] State v. White, 135 Wash.2d 761, 769, 958 P.2d 982 (1998).
[58] City of Seattle v. Mesiani, 110 Wash.2d 454, 457, 755 P.2d 775 (1988). Despite its prominent place in the Taxpayers' briefing, the City neither cites nor discusses Mesiani.
[59] 110 Wash.2d 454, 755 P.2d 775 (1988).
[60] Mesiani, 110 Wash.2d at 458-60, 755 P.2d 775.
[61] 103 Wash.2d 594, 694 P.2d 1078 (1985).
[62] The Court began its analysis with the Fourth Amendment, and held the search violated both constitutions, without conducting a separate analysis for article I, section 7. Kuehn, 103 Wash.2d at 601-02, 694 P.2d 1078.
[63] Kuehn, 103 Wash.2d at 599, 694 P.2d 1078 (quoting State v. Helmka, 86 Wash.2d 91, 93, 542 P.2d 115 (1975)).
[64] Kuehn, 103 Wash.2d at 601-02, 694 P.2d 1078.
[65] Jacobsen v. City of Seattle, 98 Wash.2d 668, 658 P.2d 653 (1983).
[66] See Jacobsen, 98 Wash.2d at 674, 658 P.2d 653. No article I, section 7 argument was made.
[67] Jacobsen, 98 Wash.2d at 673, 658 P.2d 653.
[68] Jacobsen, 98 Wash.2d at 673-74, 658 P.2d 653.
[69] Chandler v. Miller, 520 U.S. 305, 313, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (quoting Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)).
[70] Chandler, 520 U.S. at 314, 117 S.Ct. 1295.
[71] Chandler, 520 U.S. at 318, 117 S.Ct. 1295 (drug test requirement for candidates for public office violates Fourth Amendment). On three other occasions, the U.S. Supreme Court applied the "special needs" analysis to suspicionless drug testing. See Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (upholding school district's random urinalysis drug test for student participation in interscholastic athletics); National Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (rejecting challenge to U.S. Custom's Service urinalysis drug test of employees seeking promotion or transfer to positions directly involving drug interdiction or requiring the use of firearms); Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding blood and urine drug tests of railroad employees involved in train accidents).

The City relies heavily upon a pre-Skinner case, Alverado v. WPPSS, 111 Wash.2d 424, 759 P.2d 427 (1988), where our Supreme Court held that a drug testing program for nuclear plant employees was an administrative search permissible under the Fourth Amendment because of the pervasive regulation of the industry and the potential for catastrophic consequences. Significantly, the Court held application of article I, section 7 was precluded because the entire field of safety in nuclear plant facilities had been preempted by the U.S. Congress. Because the Alverado court expressly held it could not consider the state constitution, its analysis is not helpful here.
[72] Skinner, 489 U.S. at 624, 109 S.Ct. 1402.
[73] Chandler, 520 U.S. at 323, 117 S.Ct. 1295.
[74] Special needs analysis has produced a predictably large body of commentary. See, e.g., Ross H. Parr, Suspicionless Drug Testing and Chandler v. Miller: Is the Supreme Court Making the Right Decisions?, 7 WM. & MARY BILL RTS. J. 241, 276 (1998); Michael S. Vaughn, Special Needs in Criminal Justice, An Evolving Exception to the Fourth Amendment Warrant and Probable Cause Requirements, 3 GEO. MASON U. CIV. RTS. L.J. 203, 220-23 (1993).
[75] 116 Wash.2d 414, 805 P.2d 200, 812 P.2d 858 (1991).
[76] Farmer, 116 Wash.2d at 429-30, 805 P.2d 200.
[77] Farmer, 116 Wash.2d at 430, 805 P.2d 200.
[78] 121 Wash.2d 80, 847 P.2d 455 (1993).
[79] In re A, B, C, D, E, 121 Wash.2d at 90-98, 847 P.2d 455. See also State v. Olivas, 122 Wash.2d 73, 856 P.2d 1076 (1993) (special needs analysis of whether blood draw from persons convicted of violent or sex offenses for DNA data bank was impermissible intrusion under Fourth Amendment; Court declined to address article I, section 7 because no Gunwall analysis).
[80] A, B, C, D, E, 121 Wash.2d at 96-97, 847 P.2d 455 (citations omitted).
[81] A, B, C, D, E, 121 Wash.2d at 97, 847 P.2d 455.
[82] A, B, C, D, E, 121 Wash.2d at 97-98, 847 P.2d 455.
[83] See Farmer, 116 Wash.2d at 429, 805 P.2d 200; A, B, C, D, E, 121 Wash.2d at 97, 847 P.2d 455.
[84] Skinner, 489 U.S. at 617, 109 S.Ct. 1402 (quoting National Treasury Employees Union v. Von Raab, 816 F.2d 170, 175 (5th Cir.1987)).
[85] Skinner, 489 U.S. at 617, 109 S.Ct. 1402.
[86] State v. Parker, 139 Wash.2d 486, 493-94, 987 P.2d 73 (1999) ("article I, section 7 necessarily encompasses those legitimate expectations of privacy protected by the Fourth Amendment").
[87] See, e.g., Willner v. Thornburgh, 928 F.2d 1185, 1189-90 (D.C.Cir.1991).
[88] Ladson, 138 Wash.2d at 349, 979 P.2d 833 (quoting State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984)); see also State v. Young, 123 Wash.2d 173, 181-82, 867 P.2d 593 (1994) ("The right of privacy under Const. art. 1, § 7 is `not confined to the subjective privacy expectations of modern citizens who, due to well publicized advances in surveillance technology, are learning to expect diminished privacy in many aspects of their lives'.") (quoting State v. Myrick, 102 Wash.2d at 511, 688 P.2d 151).
[89] 14 Cal.4th 846, 59 Cal.Rptr.2d 696, 927 P.2d 1200 (1997).
[90] Commentators have questioned whether the Loder court would have reached the same result had the case been decided after Chandler. See Richard M. Schall, Employee Privacy Rights, 600 PLI/LIT 933, 1002 (1999).
[91] Loder, 59 Cal.Rptr.2d 696, 927 P.2d at 1223-24. The Court explicitly declined to consider what validity the program would otherwise have: "[T]he city's preemployment medical examination was a full and genuine medical examination... conducted ... for many years before the drug testing program was instituted.... [W]e have no occasion to pass upon the validity of a preemployment drug testing program conducted under other conditions or circumstances." Loder, 59 Cal.Rptr.2d 696, 927 P.2d at 1223 n. 16.
[92] Although the City relies heavily on Loder, the decision is of limited assistance to us because both the text of the California privacy provision and the test for its application differ substantially from Washington's. California's privacy provision reads: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1. Under that provision, the government must show only a "reasonable justification" for the drug testi.e., that it "substantively furthers one or more countervailing interests" not achievable by "feasible and effective alternatives" that have a lesser impact on privacy. Loder, 59 Cal.Rptr.2d 696, 927 P.2d at 1228, 1232 (relying on Hill v. National Collegiate Athletic Ass'n, 7 Cal.4th 1, 26 Cal. Rptr.2d 834, 865 P.2d 633 (1994)). This is not the test for invasions of privacy in Washington, and given the history of each state's developing common law, it is unsurprising that the California case offers little assistance here.
[93] Knox County Educ. Ass'n v. Knox County Bd. of Educ., 158 F.3d 361, 380 n. 25 (6th Cir.1998), cert. denied, 528 U.S. 812, 120 S.Ct. 46, 145 L.Ed.2d 41 (1999). The Knox court was referring to the following statement by the U.S. Supreme Court: "`There are few activities in our society more personal or private than the passing of urine.'" Knox, 158 F.3d at 380 n. 25 (quoting Skinner, 489 U.S. at 617, 109 S.Ct. 1402 (internal citation omitted)). The Knox court described the statement as "somewhat overdrawn." Knox, 158 F.3d at 380 n. 25.
[94] The City does not allege the testing is consensual.
[95] See e.g., Willner v. Thornburgh, 928 F.2d 1185, 1190 (D.C.Cir.1991) ("No one is compelled to seek a job at the Department of Justice.").
[96] 103 Wash.2d 594, 694 P.2d 1078 (1985).
[97] Kuehn, 103 Wash.2d at 600, 694 P.2d 1078.
[98] 98 Wash.2d 668, 658 P.2d 653 (1983).
[99] Jacobsen, 98 Wash.2d at 674, 658 P.2d 653.
[100] State v. Curran, 116 Wash.2d 174, 189, 804 P.2d 558 (1991) (Utter, J., concurring), overruled on other grounds by State v. Berlin, 133 Wash.2d 541, 947 P.2d 700 (1997).
[101] State v. Farmer, 116 Wash.2d 414, 429, 805 P.2d 200, 812 P.2d 858 (1991).
[102] We are aware that the Fourth Amendment cases, beginning with Skinner, describe the urinalysis testing process as a minimal invasion for Fourth Amendment purposes. See Skinner, 489 U.S. at 624, 109 S.Ct. 1402 (minimal interference); Von Raab, 489 U.S. at 672 n. 2, 109 S.Ct. 1384 ("procedures significantly minimize the program's intrusion on privacy interests"); Vernonia, 515 U.S. at 658, 115 S.Ct. 2386 (privacy interests negligibly compromised); Chandler v. Miller, 520 U.S. at 318, 117 S.Ct. 1295 (testing method "relatively noninvasive").
[103] City of Seattle v. Mesiani, 110 Wash.2d 454, 458, 755 P.2d 775 (1988).
[104] Jacobsen, 98 Wash.2d at 674, 658 P.2d 653.
[105] The invasion in fact is twofold: first, the taking of the sample, which is highly intrusive, and second, the chemical analysis of its contentswhich may involve still a third invasion, disclosure of explanatory medical conditions or treatments.
[106] Vernonia, 515 U.S. at 661, 115 S.Ct. 2386.
[107] Collier v. City of Tacoma, 121 Wash.2d 737, 754, 854 P.2d 1046 (1993) (article I, section 5).
[108] Munns v. Martin, 131 Wash.2d 192, 200, 930 P.2d 318 (1997) (article I, section 11).
[109] See A, B, C, D, E, 121 Wash.2d at 97, 847 P.2d 455.
[110] The City explained at oral argument that ushers help people find theater seats, and librarians may carry more than 25 pounds of books. This is not an explanation of public safety jeopardy.
[111] Raynes v. City of Leavenworth, 118 Wash.2d 237, 243, 821 P.2d 1204 (1992).
[112] The City's brief admits the absence of any record: "Of course, there is nothing in this record to evaluate individual City decisions to test or not to test for particular vacanciesprecisely because these taxpayers chose to bring this action as a facial challenge."
[113] See Waters v. Churchill, 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). The City also relies on Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), another First Amendment case. See also White v. State, 131 Wash.2d 1, 929 P.2d 396 (1997); Benjamin v. Washington State Bar Ass'n, 138 Wash.2d 506, 980 P.2d 742 (1999).
[114] See e.g., Macias v. Department of Labor and Indust., 100 Wash.2d 263, 668 P.2d 1278 (1983) (administrative burdens and costs do not constitute a compelling state interest to justify infringing on fundamental right to travel); Olympic Forest Prod., Inc. v. Chaussee Corp., 82 Wash.2d 418, 433, 511 P.2d 1002 (1973) ("Nor do the additional costs inherent in a prior hearing constitute a countervailing state interest sufficient to override the fundamental procedural safeguards demanded by due process."). See also Hunter v. North Mason High Sch. and Sch. Dist. No. 403, 85 Wash.2d 810, 818, 539 P.2d 845 (1975) ("[W]e cannot uphold nonclaim statutes simply because they serve to protect the public treasury."); Hill v. National Collegiate Athletic Ass'n, 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633 (1994) ("the Fourth Amendment ... has generally been interpreted to require more than an employer interest in employee job performance ... to justify drug testing without reasonable suspicion").
[115] Olympic Forest Prod., 82 Wash.2d at 433, 511 P.2d 1002 (quoting Fuentes v. Shevin, 407 U.S. 67, 90 n. 22, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)).
[116] See, e.g., Jacohsen v. City of Seattle, 98 Wash.2d 668, 674-75, 658 P.2d 653 (1983).
[117] 123 Wash.2d 260, 281, 868 P.2d 134 (1994).