**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE_____
~Fairhurst. CJ.~
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Aug 3, 2017

~Susan L. Carlson~
SUSAN L. CARLSON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 93315-4 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| BRITTANIE J. OLSEN, | ) | |
| | ) | Filed ___AUG 0 3 2017___ |
| Petitioner. | ) | |
| | ) | |

OWENS, J. — At issue in this case is whether a court may require a probationer convicted of driving under the influence (DUI) to submit to random urinalysis testing (UAs) for controlled substances. In particular, this issue centers on whether this testing violates DUI probationers' privacy interests under article I, section 7 of our state constitution. Random UAs do implicate a probationer's reduced privacy interests. But here, where urinalysis was authorized to monitor compliance with a valid probation condition requiring Olsen to refrain from drug and alcohol consumption, the testing does not violate article I, section 7. Accordingly, we affirm the Court of Appeals.

*State v. Olsen*
No. 93315-4

FACTS

The facts are undisputed. In June 2014, Brittanie Olsen pleaded guilty in Jefferson County District Court to one count of DUI, a gross misdemeanor offense under RCW 46.61.502. The court imposed a sentence of 364 days of confinement with 334 days suspended. As a condition of her suspended sentence, the court ordered that Olsen not consume alcohol, marijuana, or nonprescribed drugs. Over defense objection, the court also required Olsen to submit to "random urine analysis screens . . . to ensure compliance with conditions regarding the consumption of alcohol and controlled substances." Clerk's Papers (CP) at 5.

Olsen appealed to Jefferson County Superior Court, arguing that the random UAs requirement violated her privacy rights under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution. She contended a warrantless search of a misdemeanant probationer may not be random but instead "must be supported by a well-founded suspicion that the probationer has violated a condition of her sentence." CP at 7. The court agreed, vacated Olsen's sentence, and remanded to the district court for resentencing without the requirement that Olsen submit to random urine tests.

The State appealed, and the Court of Appeals reversed, holding that "offenders on probation for DUI convictions do not have a privacy interest in

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*
No. 93315-4

preventing the random collection and testing of their urine when used to ensure compliance with a probation condition prohibiting the consumption of alcohol, marijuana, and/or nonprescribed drugs." *State v. Olsen*, 194 Wn. App. 264, 272, 374 P.3d 1209 (2016). Olsen then petitioned this court for review, which was granted. *State v. Olsen*, 186 Wn.2d 1017, 383 P.3d 1020 (2016).

## ISSUE

Do random UAs ordered to monitor compliance with a valid probation condition not to consume drugs or alcohol violate a DUI probationer's privacy interests under article I, section 7 of the Washington Constitution?

## ANALYSIS

The Washington State Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7. It is well established that in some areas, this provision provides greater protection than the Fourth Amendment, its federal counterpart. *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 306, 178 P. 3d 995 (2008) (plurality opinion).

One area of increased protection is the collection and testing of urine. *Id.* at 307. Compared to the federal courts, "we offer heightened protection for bodily

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

functions." [1] *Id.* Washington courts have generally held that for ordinary citizens, suspicionless urinalysis testing constitutes a disturbance of one's private affairs that, absent authority of law, violates article I, section 7. *Id.* at 316 (holding that suspicionless urinalysis tests of student athletes violate article I, section 7); *Robinson v. City of Seattle*, 102 Wn. App. 795, 811, 10 P.3d 452 (2000) (holding that preemployment UAs for jobs that do not directly relate to public safety violate article I, section 7).

On the other hand, we have repeatedly upheld blood or urine tests of prisoners, probationers, and parolees without explicitly conducting an analysis under article I, section 7. For example, in *In re Juveniles A, B, C, D, E*, we upheld HIV (human immunodeficiency virus) tests of convicted felons without individualized suspicion, but decided the case under the Fourth Amendment instead of our state constitutional provision. 121 Wn.2d 80, 98, 847 P.2d 455 (1993); *see also State v. Olivas*, 122 Wn.2d 73, 856 P.2d 1076 (1993) (DNA (deoxyribonucleic acid) blood testing of convicted felons). In other cases, lower courts have upheld random drug testing of probationers or parolees on statutory

---

[1] The parties seem to agree that article I, section 7 provides greater protection than the Fourth Amendment in this context. Accordingly, they do not analyze the issue under the federal constitution. Neither party has suggested performing an analysis under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986) to determine whether article I, section 7 provides broader protection than the Fourth Amendment under the specific facts of this case.

grounds, without examining the question under either constitution. *See, e.g., State v. Acevedo*, 159 Wn. App. 221, 234, 248 P.3d 526 (2010); *State v. Vant*, 145 Wn. App. 592, 603-04, 186 P.3d 1149 (2008).

We have not, however, directly addressed the issue under our state constitutional provision. Two inquiries are implicit in an article I, section 7 claim: (1) whether the contested state action "disturbed" a person's "private affair[s]" and, if so, (2) whether the action was undertaken with "authority of law." *State v. Reeder*, 184 Wn.2d 805, 814, 365 P.3d 1243 (2015). "Part of this inquiry focuses on what kind of protection has been historically afforded to the interest asserted, and part of it focuses on the nature and extent of the information that may be obtained as a result of government conduct." *Id.* (citing *State v. Miles*, 160 Wn.2d 236, 244, 156 P.3d 864 (2007)).

*A. UAs Implicate a DUI Probationer's Privacy Interests*

We first look to whether UAs disturb DUI probationers' "private affairs." More specifically, we consider whether providing a urine sample is among "'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass.'" *Id.* (quoting *In re Pers. Restraint of Maxfield*, 133 Wn.2d 332, 339, 945 P.2d 196 (1997)).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*
No. 93315-4

We have consistently held that the nonconsensual removal of bodily fluids implicates privacy interests. *York*, 163 Wn.2d at 307; *Juveniles*, 121 Wn.2d at 90; *Olivas*, 122 Wn.2d at 83; *State v. Curran*, 116 Wn.2d 174, 184, 804 P.2d 558 (1991), *abrogated on other grounds by State v. Berlin*, 133 Wn.2d 541, 947 P.2d 700 (1997). UAs implicate privacy interests in two ways. First, the act of providing a urine sample is fundamentally intrusive. This is particularly true where urine samples are collected under observation to ensure compliance.[2] *See York*, 163 Wn.2d at 308 ("Even if done in an enclosed stall, this is a significant intrusion on a student's fundamental right of privacy."). Second, "chemical analysis of urine, like that of blood, can reveal a host of private medical facts about [a person], including whether he or she is epileptic, pregnant, or diabetic." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989). These privacy interests are precisely what article I, section 7 is meant

---

[2] The record does not contain details of the procedure used in this case, but direct observation of urination is a common requirement for UAs conducted in the criminal justice system. *See, e.g.*, U.S. DEP'T OF JUSTICE OFFICE OF JUSTICE PROGRAMS, BUREAU OF JUSTICE ASSISTANCE, AMERICAN PROBATION AND PAROLE ASSOCIATION'S DRUG TESTING GUIDELINES FOR PRACTICES FOR ADULT PROBATION AND PAROLE AGENCIES 42-43 (1991) (providing for "direct observation of the collection process"), https:// https://www.appa-net.org/eweb/docs/appa/pubs/DTGPAPPA.pdf [https://perma.cc/Y33J-BYY7]; KING COUNTY DRUG DIVERSION COURT, PARTICIPANT HANDBOOK 8 (2015) ("The observed collection and scientific testing of your urine for drugs, alcohol, and other mood-altering substances is an important part of [drug diversion court]."), http://www.kingcounty.gov/~/media/courts/Clerk/drugCourt/documents/KCDDC_Participant_Handbook.ashx?la=en [https://perma.cc/UT69-GJXA].

to protect. *See State v. Jorden*, 160 Wn.2d 121, 126, 156 P.3d 893 (2007) ("[A]

central consideration [under article I, section 7] is . . . whether the information

obtained via the governmental trespass reveals intimate or discrete details of a

person's life.").

However, probationers do not enjoy constitutional privacy protection to the

same degree as other citizens. Probationers have a reduced expectation of privacy

because they are "persons whom a court has sentenced to confinement but who are

serving their time outside the prison walls." *State v. Jardinez*, 184 Wn. App. 518,

523, 338 P.3d 292 (2014); *see also State v. Simms,* 10 Wn. App. 75, 82, 516 P.2d

1088 (1973) (parolees and probationers still "in custodia legis" until expiration of

maximum term of sentence). Therefore, the State may supervise and scrutinize a

probationer more closely than it may other citizens. *State v. Lucas,* 56 Wn. App.

236, 240, 783 P.2d 121 (1989); *State v. Parris*, 163 Wn. App. 110, 117, 259 P.3d

331 (2011). However, "this diminished expectation of privacy is constitutionally

permissible only to the extent 'necessitated by the legitimate demands of the

operation of the parole process.'" *Parris*, 163 Wn. App. at 117 (internal quotation

marks omitted) (quoting *Simms*, 10 Wn. App. at 86).

Nevertheless, relying on *State v. Surge*, 160 Wn.2d 65, 156 P.3d 208 (2007)

(plurality opinion), the State argues that UAs do not implicate Olsen's privacy

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

interests because probationers lack any privacy interest in their urine. We disagree. Even though misdemeanant probationers have a reduced expectation of privacy, this does not mean that they have no privacy rights at all in their bodily fluids.

In *Surge*, we considered the constitutionality of a statute that authorized the collection of convicted felons' DNA for identification purposes. *Id.* at 69. A plurality held that the statute is constitutional, reasoning that incarcerated felons lack a privacy interest in their identities due to their status. But *Surge* is distinguishable from this case. First, it involved incarcerated felons, not misdemeanant probationers. *Id.* at 72. Further, the lead opinion in *Surge* emphasized that the DNA test was only for identification purposes. *Id.* at 79 ("the statute does not unconstitutionally authorize disturbance of an individual's bodily integrity by allowing the DNA results to be used for purposes other than identity"). The UAs here gather information beyond the probationer's identity by analyzing urine for the presence of controlled substances. Although these tests are meant to enforce probation conditions, they also collect evidence for possible revocation hearings, implicating the probationer's liberty interests. *See Simms*, 10 Wn. App. at 83-84 (probationers have an interest in their continued liberty). *Surge* does not

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

support the State's argument that DUI probationers lack any privacy interest whatsoever in their urine.

In sum, even though probationers do not enjoy the same expectation of privacy as other citizens, the UAs here still implicate their reduced privacy interests under article I, section 7.

### B. Random UAs of DUI Probationers Do Not Violate Article I, Section 7 Because They Are Conducted with Authority of Law

Next, we turn to the second step of our inquiry under article I, section 7: whether the invasion is performed with authority of law. The government has a compelling interest in disturbing Olsen's privacy interest in order to promote her rehabilitation and protect the public. The random testing here is narrowly tailored to monitor compliance with a validly imposed probation condition. Thus, the judgment and sentence constitutes sufficient "authority of law" to require random UAs here.

Typically, under article I, section 7, an intrusion into an individual's private affairs is conducted with authority of law when it is supported by a warrant or a recognized exception to the warrant requirement. *York*, 163 Wn.2d at 310. But because probationers have a reduced expectation of privacy, the State does not need a warrant, an applicable warrant exception, or even probable cause to search a probationer. *See Lucas*, 56 Wn. App. at 243-44. However, as discussed above,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

probationers do not forfeit their rights entirely and thus some authority of law must still justify the intrusion into their reduced expectation of privacy. *See Parris*, 163 Wn. App. at 117.

We have examined what constitutes "authority of law" to drug test "ordinary citizens," striking down suspicionless drug testing of students and other members of the public. For example, in *York*, a plurality of this court held that no authority of law justified drug testing of student athletes. 163 Wn.2d at 315. We noted that student athletes' privacy interests differ from those of convicted offenders, as students have "merely attended school and chosen to play extracurricular sports." *Id.*; *see also Kuehn v. Renton Sch. Dist. No. 403*, 103 Wn.2d 594, 602, 694 P.2d 1078 (1985) (plurality opinion) (school officials violated article I, section 7 when they mandated across the board search of luggage as a condition of participating in band concert tour). The lead opinion also declined to adopt a doctrine akin to the federal "special needs" exception in the context of randomly drug testing student athletes. *York*, 163 Wn.2d at 316; *see also Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987) (defining the federal "special needs" exception).

But DUI probationers are distinguishable from student athletes. Olsen was convicted of a crime and is still in the State's legal custody. *Simms,* 10 Wn. App.

*State v. Olsen*
No. 93315-4

at 82. She has a duty to engage in her rehabilitation in exchange for the privilege of being relieved from jail time and "should expect close scrutiny" of her conduct. *Lucas*, 56 Wn. App. at 241; *see also City of Spokane v. Marquette*, 146 Wn.2d 124, 132, 43 P.3d 502 (2002). Her privacy interests are more constrained than those of a student athlete or a performer.

Justices of this court have suggested a balancing test may be appropriate to evaluate whether there is "authority of law" in these circumstances. In *Surge*, Justice Fairhurst suggested a compelling interests test, stating that "[o]utside the law enforcement context, this court applies a two-part, narrowly tailored compelling state interest test to determine whether state intrusions of autonomous decision making privacy interests were conducted under authority of law." 160 Wn.2d at 91 (Fairhurst, J., concurring in the dissent); *see also Juveniles*, 121 Wn.2d at 97-98; *State v. Farmer*, 116 Wn.2d 414, 430-31, 805 P.2d 200 (1991); *Robinson*, 102 Wn. App. at 816-18. In *York*, Justice J.M. Johnson suggested a similar test, noting that "a constitutional program of random suspicionless drug testing of student athletes should advance compelling interests, show narrow tailoring, and employ a less intrusive method of testing." 163 Wn.2d at 342 (J.M. Johnson, J., concurring).

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

We find these considerations useful here, in light of probationers'
significantly reduced expectation of privacy and the unique nature and
rehabilitative goals of the probation system. We therefore examine whether a
compelling interest, achieved through narrowly tailored means, supports the
intrusion into a DUI probationer's reduced privacy interests.

1. *The State Has a Strong Interest in Supervising DUI Probationers in Order To Promote Rehabilitation and Protect the Public*

Probation is "simply one point (or, more accurately, one set of points) on a
continuum of possible punishments." *Griffin*, 483 U.S. at 874. It is not a right, but
"an act of judicial grace or lenience motivated in part by the hope that the offender
will become rehabilitated." *Gillespie v. State*, 17 Wn. App. 363, 366-67, 563 P.2d
1272 (1977) (citing *State ex rel. Woodhouse v. Dore*, 69 Wn.2d 64, 416 P.2d 670
(1966)). A sentencing court has great discretion to impose conditions and
restrictions of probation to "assure that the probation serves as a period of genuine
rehabilitation and that the community is not harmed by the probationer's being at
large." *Griffin*, 483 U.S. at 875; *see also State v. Summers,* 60 Wn.2d 702, 707,
375 P.2d 143 (1962).

As such, the State has a compelling interest in closely monitoring
probationers in order to promote their rehabilitation. *Parris*, 163 Wn. App. at 117.
As probation officers' role is "rehabilitative rather than punitive in nature," they

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*
No. 93315-4

must, then, have tools at their disposal in order to accurately assess whether rehabilitation is taking place. *State v. Reichert*, 158 Wn. App. 374, 387, 242 P.3d 44 (2010); *see also Simms,* 10 Wn. App. at 85 (probation officers' duties differ from police officers "'ferreting out crime'" (quoting *Johnson v. United States,* 333 U.S. 10, 14, 68 S. Ct. 367, 92 L. Ed. 436 (1948))).

The State has a duty not just to promote and assess the rehabilitation of a probationer, but also to protect the public. *State v. Kuhn,* 7 Wn. App. 190, 194, 499 P.2d 49 (1972) ("[i]n granting or denying probation, the judge makes the delicate balance of protecting the rights of the public and providing for the rehabilitation of the offender"). The public safety risk here is substantial: fatalities in crashes involving alcohol-impaired drivers continue to represent almost one-third (31 percent) of the total motor vehicle fatalities in the United States. In Washington, the proportion is even higher than the national average: impaired driving is one of the leading contributors to highway deaths and major injuries.[3] Offender treatment and monitoring, however, are effective countermeasures to prevent driving fatalities and reduce recidivism. *See generally* U.S. DEP'T OF

---

[3] *See* WASH. STATE DEP'T OF TRANSP., WASHINGTON STATE STRATEGIC HIGHWAY SAFETY PLAN 6 (2013), https://www.wsdot.wa.gov/NR/rdonlyres/5FC5452D-8217-4F20-B2A9-080593625C99/0/TargetZeroPlan.pdf [https://perma.cc/V2HW-XA4M]; MOTHERS AGAINST DRUNK DRIVING, *2013 Drunk Driving Fatalities by State* (drunk driving cause of 34 percent of traffic deaths in Washington in 2013), http://www.madd.org/blog/2014/december/2013-drunk-driving-fatalities.html [https://perma.cc/KTF4-L75B] (last visited July 27, 2017).

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

TRANSP., NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., COUNTERMEASURES THAT WORK: A HIGHWAY SAFETY COUNTERMEASURE GUIDE FOR STATE HIGHWAY SAFETY OFFICES 1-4 (8th ed. 2015) (COUNTERMEASURES), https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/812202-countermeasuresthatwork8th.pdf [https://perma.cc/N4UC-6K8E].

Thus, the State has a compelling interest here in supervising a probationer in order to assess his or her progress toward rehabilitation and compliance with probation conditions. In the case of DUI probationers, monitoring and supervision ensure that treatment is taking place and serve to protect the public in the case that a probationer fails to comply with court-imposed conditions.

2. *Random UAs Are Narrowly Tailored To Monitor Compliance with Another Probation Condition*

Next, we examine whether random UAs are a narrowly tailored means of effectuating the State's goals. We find that here, random UAs are narrowly tailored: they are a crucial monitoring tool that is limited in scope when imposed only to assess compliance with a valid prohibition on drug and alcohol use.

a. *Random UAs Are an Effective Monitoring Tool*

We have approved of monitoring tools used to enforce a valid parole or probation conditions. *State v. Riles*, 135 Wn.2d 326, 339, 342, 957 P.2d 655 (1998) (discussing polygraph testing and UAs), *abrogated on other grounds by*

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*
No. 93315-4

*State v. Valencia*, 169 Wn.2d 782, 239 P.3d 1059 (2010); *see also State v. Combs*, 102 Wn. App. 949, 952, 10 P.3d 1101 (2000) (concluding that polygraph testing may be ordered to monitor offender's compliance with other conditions). As the Court of Appeals discussed in detail, the trial court permissibly conditioned Olsen's release on her agreement to refrain from drug and alcohol use. *See* RCW 3.66.067; RCW 46.61.5055; *State v. Williams*, 97 Wn. App. 257, 262-63, 983 P.2d 687 (1999). It follows that the trial court also has authority to monitor compliance with that condition through narrowly tailored means.

Random UAs are a permissible means here. UAs are an important monitoring tool utilized by courts during the rehabilitative process of probation. *See, e.g.*, *Williams*, 97 Wn. App. at 260 (authorizing requirement that probationer submit to a breath test, blood test, or UA upon probation officer's request); KING COUNTY DRUG DIVERSION COURT, PARTICIPANT HANDBOOK 5-7 (2015) (drug court participants required to participate in random, observed UAs) http://www.kingcounty.gov/~/media/courts/Clerk/drugCourt/documents/KCDDC_Participant_Handbook.ashx?la=en [https://perma.cc/UT69-GJXA]. Unannounced testing is, arguably, crucial if a court is to impose drug testing at all.[4] Random

---

[4] *See* U.S. DEP'T OF JUSTICE OFFICE OF JUSTICE PROGRAMS, DRUG COURT PROGRAM OFFICE, DRUG TESTING IN A DRUG COURT ENVIRONMENT: COMMON ISSUES TO ADDRESS (2000) (DRUG TESTING) (stating that the effective operation of a drug court program is premised on having the

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*
No. 93315-4

testing seeks to deter the probationer from consuming drugs or alcohol by putting her on notice that drug use can be discovered at any time. It also promotes rehabilitation and accountability by providing the probation officer with a "practical mechanism to determine whether rehabilitation is indeed taking place." *Macias v. State*, 649 S.W.2d 150, 152 (Tex. Crim. App. 1983) (weekly UAs).

Amicus curiae American Civil Liberties Union (ACLU) argues that random UAs are unnecessary. As an alternative, it suggests that UAs should be permitted only if a probation officer has a well-founded suspicion of a probation violation. It points out that probation officers could detect alcohol or drug use by receiving a tip or "tak[ing] note of drug paraphernalia or alcohol while visiting the probationer." Br. of Amicus Curiae ACLU at 18. But such a standard would be impracticable here. Drug or alcohol impairment can be difficult to detect by observation. *See, e.g.*, *Skinner*, 489 U.S. at 628-29. Additionally, as noted by the National Drug Court Institute, "it is crucial that samples be collected in a random, unannounced

---

capacity to conduct frequent and random drug tests of participants, obtain test results immediately, and maintain a high degree of accuracy in test results), https://www.ncjrs.gov/pdffiles1/ojp/181103.pdf [https://perma.cc/J7N9-C66P]; COUNTERMEASURES, *supra*, at 1-43 (driving while intoxicated offender monitoring, including randomized drug testing proven to reduce recidivism); AM. SOC'Y OF ADDICTION MED., DRUG TESTING: A WHITE PAPER OF THE AMERICAN SOCIETY OF ADDICTION MEDICINE 40 (2013) (random testing preferred over scheduled testing), https://www.asam.org/docs/default-source/public-policy-statements/drug-testing-a-white-paper-by-asam.pdf?sfvrsn=125866c2_4 [https://perma.cc/C2PB-Q66D].

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*
No. 93315-4

manner," as random testing prevents individuals from planning ahead and avoiding detection.[5] Requiring reasonable suspicion as a basis to test could make it prohibitively difficult for the probation officer to carry out his or her responsibilities of supervising the probationer and accurately assessing progress toward rehabilitation. *See State v. Zeta Chi Fraternity*, 142 N.H. 16, 28, 696 A.2d 530 (1997) (citing *State v. Berrocales,* 141 N.H. 262, 681 A.2d 95 (1996)).

### b. The Judgment and Sentence Limits the Scope of the Random UAs To Monitor Compliance with a Valid Probation Condition

Amicus curiae also argues that allowing random UAs of DUI probationers would open the door to permitting random, suspicionless searches of *all* probationers. We disagree: random UAs are distinguishable from other, more broad-sweeping probation conditions. The judgment and sentence here limits the scope of the testing to monitor compliance with a valid restriction on drug and alcohol use.

It is true that there are a host of cases in which lower courts analyzed other parole and probation conditions and found that in those contexts, reasonable suspicion is required to search the offender's home, vehicle, or electronic devices.

---

[5] NAT'L DRUG COURT INST., THE DRUG COURT JUDICIAL BENCHBOOK 121, https://www.ndci.org/wp-content/uploads/14146_NDCI_Benchbook_v6.pdf [https://perma.cc/36L3-XHMR]; *see also* DRUG TESTING, *supra*, at 10.

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*See Jardinez*, 184 Wn. App. at 523-24 (search of parolee's iPod); *Parris*, 163 Wn. App. at 117 (search of memory cards found in parolee's room); *State v. Massey*, 81 Wn. App. 198, 199, 913 P.2d 424 (1996) (parolee ordered to "'submit to testing and searches of [his] person, residence and vehicle'" (alteration in original)); *Lucas*, 56 Wn. App. at 240 (search of probationer's home); *State v. Lampman*, 45 Wn. App. 228, 233, 724 P.2d 1092 (1986) (search of probationer's purse); *State v. Keller*, 35 Wn. App. 455, 457, 667 P.2d 139 (1983) (search of residence pursuant to condition that "'[d]efendant shall submit to a search of residence, person and vehicle upon request'"); *State v. Coahran*, 27 Wn. App. 664, 666-67, 620 P.2d 116 (1980) (search of parolee's truck). Courts require reasonable suspicion for such searches in part because these intrusions run the risk of exposing a large amount of private information.

As discussed above, UAs can also potentially reveal a variety of private facts about a person. *Skinner*, 489 U.S. at 617. However, the judgment and sentence here explicitly authorizes random UAs only to "ensure compliance with conditions regarding the consumption of alcohol and controlled substances." CP at 5; *Williams,* 97 Wn. App. at 263-64. While the record does not contain information about the specific procedure used to conduct the UAs, we apply a commonsense reading to the judgment and sentence and find that it authorizes urinalysis only to

18

test for drugs and alcohol. *See State v. Figeroa Martines*, 184 Wn.2d 83, 93, 355 P.3d 1111 (2015) (applying a commonsense reading to warrant and concluding it authorized tests performed to detect the presence of drugs or alcohol). It impliedly limits the scope of the testing to monitor only Olsen's compliance with an underlying probation condition. *See Combs*, 102 Wn. App. at 953 (scope of community placement order impliedly limits scope of polygraph testing).

Olsen was convicted of DUI, a crime involving the abuse of drugs and alcohol. A probationer convicted of DUI can expect to be monitored for consumption of drugs and alcohol, but should not necessarily expect broader-ranging intrusions that expose large amounts of private information completely unrelated to the underlying offense. For example, a probation condition authorizing suspicionless searches of Olsen's home might turn up evidence of drug and alcohol use, but would almost certainly reveal other, unrelated information about her private affairs. *See State v. Winterstein*, 167 Wn.2d 620, 630, 220 P.3d 1226 (2009). But random UAs, if limited to monitoring for the presence of alcohol, marijuana, or nonprescribed drugs, reveal a comparatively limited amount of private information. Unlike a search of a home, the information potentially revealed is directly linked to the "class of criminal behavior" that Olsen engaged in. *Juveniles*, 121 Wn.2d at 92-93. Random UAs also run a smaller risk of

19

inadvertently exposing other private information unrelated to the underlying prohibition on drug and alcohol use.

We also reiterate that DUI probationers have been sentenced to confinement but are "serving their time outside the prison walls." *Jardinez*, 184 Wn. App. at 523. Keeping that in mind, UAs have the same privacy implications whether an individual is serving her time in prison or on probation. A search of a probationer's home, by comparison, has much wider-ranging privacy implications than a search of a prisoner's cell. For example, a search of a residence implicates not just the probationer's privacy, but potentially the privacy of third parties. In *Winterstein*, we noted that third party privacy interests must be considered when probation officers seek to search a probationer's residence, and held that probation officers are required to have probable cause to believe that their probationers live at the residence they seek to search. 167 Wn.2d at 630. But such considerations are inapplicable in this context.

Accordingly, we hold that random UAs, under certain circumstances, are a constitutionally permissible form of close scrutiny of DUI probationers. We find that the testing here is a narrowly tailored monitoring tool imposed pursuant to a valid prohibition on drug and alcohol use. Random UAs are also directly related to a probationer's rehabilitation and supervision.

However, we clarify that our decision today does not mean that probationers have no protection. Random UAs could potentially lack "authority of law" absent a sufficient connection to a validly imposed probation condition or if the testing is conducted in an unreasonable manner. We also reaffirm that general, exploratory searches are not permissible under article I, section 7. *See Kuehn,* 103 Wn.2d at 601-02 (general searches are "anathema to Fourth Amendment and Const. art. 1, § 7 protections"). As such, while we find that random UAs may be permissible in order to monitor compliance with valid probation conditions, they may not be used impermissibly as part of "a fishing expedition to discover evidence of other crimes, past or present." *Combs,* 102 Wn. App. at 953.

CONCLUSION

While random UAs of DUI probationers do implicate privacy interests, the UAs here are narrowly tailored and imposed to monitor compliance with a valid probation condition. The judgment and sentence impliedly limits the scope of testing to monitor only for alcohol and controlled substances. Taking into consideration Olsen's reduced privacy interests as a probationer, we conclude that the random UAs here were conducted with "authority of law" under article I, section 7 of our state constitution. We affirm the Court of Appeals.

*State v. Olsen*
No. 93315-4

Owens, J.

WE CONCUR:

Wiggins, J.

González, J.

Madsen, J.

Stephens, J.

Yu, J.

22

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

No. 93315-4

FAIRHURST, C.J. (dissenting)—When the State collects and analyzes a probationer's urine, it disturbs that probationer's private affairs. For decades, Washington courts have held that similar intrusions bear the authority of law only when supported by a reasonable suspicion that a probation condition has been violated. This straightforward application of existing law should control our decision here. But, uncomfortable with this result, the majority declines to apply the law as it is and instead adopts a new test—cut from whole cloth and proposed by no party in this case—to achieve its desired outcome. This change in the law diminishes the promise of privacy enshrined in the Washington Constitution and confuses the standard we use to evaluate probationary searches. For these reasons, I dissent.

I agree with the majority that although probationers have a reduced privacy interest, a urinalysis test nevertheless implicates their privacy under article I, section 7 of the Washington Constitution. The remaining issue is whether this intrusion is

1

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

conducted with the authority of law. *See York v. Wahkiakum Sch. Dist. No. 200*, 163

Wn.2d 297, 306, 178 P. 3d 995 (2008) (plurality opinion).

Typically, a search is conducted with the authority of law when it is supported

by a warrant or a recognized exception to the warrant requirement. *Id.* at 310. But

I agree with the majority that because probationers have a reduced expectation of

privacy, the State does not need a warrant, an applicable warrant exception, or even

probable cause to search a probationer. *See State v. Lucas*, 56 Wn. App. 236, 243-

44, 783 P.2d 121 (1989). Still, the State may not engage in suspicionless searches

of probationers. *Id.*; *see also York*, 163 Wn.2d at 314 ("[W]e have a long history of

striking down exploratory searches not based on at least reasonable suspicion.");

*State v. Jorden*, 160 Wn.2d 121, 127, 156 P.3d 893 (2007) ("[T]his court has

consistently expressed displeasure with random and suspicionless searches,

reasoning that they amount to nothing more than an impermissible fishing

expedition."). Instead, "[a] warrantless search of [a] parolee or probationer is

reasonable if an officer has well-founded suspicion that a violation has occurred."

*State v. Parris*, 163 Wn. App. 110, 119, 259 P.3d 331 (2011).

Indeed, every case addressing the issue has held that a warrantless search of a

probationer's person, residence, or effects must be based on a reasonable suspicion

that a probation violation has occurred. *State v. Jardinez*, 184 Wn. App. 518, 523-

24, 338 P.3d 292 (2014); *Parris*, 163 Wn. App. at 117; *Lucas*, 56 Wn. App. at 240;

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen,* No. 93315-4
(Fairhurst, C.J., dissenting)

*State v. Lampman,* 45 Wn. App. 228, 233, 724 P.2d 1092 (1986); *State v. Keller,* 35 Wn. App. 455, 459-60, 667 P.2d 139 (1983); *State v. Coahran,* 27 Wn. App. 664, 666-67, 620 P.2d 116 (1980); *State v. Simms,* 10 Wn. App. 75, 85-86, 516 P.2d 1088 (1973). In *State v. Massey,* 81 Wn. App. 198, 200-01, 913 P.2d 424 (1996), the Court of Appeals held that searches pursuant to a probation condition identical to the one at issue here must be supported by reasonable suspicion.[1] I would hold that probationary urinalysis tests are subject to the same requirement.

Reasonable suspicion is not an onerous burden. In this context, reasonable suspicion is something less than probable cause and analogous to the requirements of a *Terry*[2] stop—articulable facts and rational inferences suggesting a substantial possibility that a probation violation has occurred. *Parris,* 163 Wn. App. at 119. This minimal restraint on the State is intended to prevent arbitrary and capricious searches. *See Simms,* 10 Wn. App. at 84 ("Considering the interest of the parolee in his liberty and privacy, it would seem to be beyond question that to subject the

---

[1] The Court of Appeals upheld the condition, explaining that although the language contained no "reasonable suspicion" requirement, the issue of the constitutionality of the condition was not ripe for review because the probationer had yet to be searched. *Massey,* 81 Wn. App. at 200. The court speculated that reasonable suspicion language might not be required in the probation condition, as courts have upheld other conditions without such language. *Id.* at 201 (citing *Lucas,* 56 Wn. App. at 237-38). Nevertheless, the court noted that "regardless of whether the sentencing court includes such language in its order, the standard for adjudicating a challenge to any subsequent search remains the same: Searches must be based on reasonable suspicion." *Id.*

[2] *Terry v. Ohio,* 392 U.S. 1, 9, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

3

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

parolee to arbitrary and capricious searches at the whim of his parole officer would be constitutionally impermissible.").

But the majority removes this minimal restraint, concluding that suspicionless urinalysis tests are constitutionally permissible because they are narrowly tailored to a compelling state interest. Majority at 20-21. Before today, this test was not the law; it has been "Frankensteined" from parts scattered across concurrences that, at the time, could not garner majority support from this court.[3] This new test brings our jurisprudence closer to federal Fourth Amendment analysis and opens the door to substantial confusion in the probationary context and beyond.

Federal courts permit warrantless searches under the Fourth Amendment to the United States Constitution when the government can show a special need beyond the normal needs for law enforcement that makes the probable cause requirement impracticable. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989). The Supreme Court has applied this doctrine to justify warrantless probationary searches. *Griffin v. Wisconsin*, 483 U.S. 868, 873,

---

[3] The majority also cites *State v. Farmer*, 116 Wn.2d 414, 805 P.2d 200 (1991). There, we suggested that a "fundamental liberty interest may be justifiably limited by a narrowly drawn, compelling state interest." *Id.* at 429. But we recognized this theory was limited to only four unique circumstances not relevant here, and we ultimately declined to apply such a test in that case, which involved nonconsensual HIV (human immunodeficiency virus) testing. *Id.* at 431 (nonconsensual HIV testing unconstitutional as applied to the defendant). Since *Farmer*, we have further declined to apply this test despite numerous opportunities to do so. Until today, it appears no Washington court has relied on *Farmer* to justify an invasion of privacy under article I, section 7.

4

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987). Although we have thus far declined to adopt a special needs exception to the warrant requirement under article I, section 7, majority at 10, today the majority muddies the waters by adopting its functional equivalent.

Despite using slightly different language, the majority's new test bears all the indicia of the federal special needs exception under the Fourth Amendment. Like the majority's test, the special needs exception requires a compelling state interest. *See, e.g., Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 675 n.3, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989) ("It is sufficient that the Government have a compelling interest in preventing an otherwise pervasive societal problem."). Further, the state must demonstrate that the warrant or probable cause requirement would be impracticable given the nature of the compelling interest at stake. *Griffin*, 483 U.S. at 873. The majority echoes this reasoning as well, noting that demonstrating reasonable suspicion "could make it prohibitively difficult for the probation officer to carry out his or her responsibilities." Majority at 16-17.

Typically, special needs searches must also be narrowly tailored in the sense that the intrusion is minimal. *See, e.g., Skinner*, 489 U.S. at 624-25; *see also Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 384 (6th Cir. 1998) (noting the state's interest in a drug testing regime for teachers outweighed the teachers' privacy interests because it "is circumscribed, narrowly-tailored, and not

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

overly intrusive, either in its monitoring procedures or in its disclosure requirements"). Indeed, many federal courts recharacterize the special needs doctrine into nearly the same formulation that the majority adopts here. *See Skinner*, 489 U.S. at 624 ("[W]here the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion."); *see also United States v. Stewart*, 468 F. Supp. 2d 261, 268 (D. Mass. 2007) ("[T]he 'special needs' exception requires a governmental purpose narrowly tailored to the means used to effectuate that purpose." (citing *Skinner*, 489 U.S. at 629-30)), *rev'd on other grounds*, 532 F.3d 32 (1st Cir. 2008); *Green v. Berge*, 354 F.3d 675, 679 (7th Cir. 2004) ("Wisconsin's DNA [(deoxyribonucleic acid)] collection statute is, we think, narrowly drawn, and it serves an important state interest. . . . The Wisconsin law withstands constitutional attack under the firmly entrenched 'special needs' doctrine."); *compare Skinner*, 489 U.S. at 619 (describing special needs analysis as "balanc[ing] the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements"), *with* majority at 11 (stating a "balancing test may be appropriate" to determine whether the state interest justifies the intrusion here). In *York*, this court equated the special needs doctrine to the strict scrutiny analysis the majority now adopts, emphasizing that no such doctrine exists under

6

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

article I, section 7. *See York*, 163 Wn.2d at 314 ("[W]e have not created a general special needs exception or *adopted a strict scrutiny type analysis* that would allow the State to depart from the warrant requirement whenever it could articulate a special need beyond the normal need for law enforcement." (emphasis added)).

Despite any minute differences, the parallels are too substantial and too significant to deny. Apart from the magic words, the majority's strict scrutiny test is nearly indistinguishable from the federal special needs doctrine. This expansion of article I, section 7 jurisprudence could have a substantial effect on how we evaluate searches in the probationary context and beyond. Indeed, it is difficult to imagine a warrantless government intrusion that would satisfy the special needs doctrine but not the strict scrutiny test the court adopts today.

Of course, looking to the federal courts for guidance is not necessarily unusual or improper. When appropriate, we occasionally consider federal constitutional analysis when reviewing analogous provisions in the Washington Constitution. *See, e.g., State v. Lee*, 135 Wn.2d 369, 387, 957 P.2d 741 (1998) (Absent a demonstration that the Washington Constitution provides broader protection, we will interpret it "coextensively with its parallel federal counterpart.").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

But the majority has co-opted the special needs doctrine surreptitiously. Rather than expressly adopt such a doctrine, which we have contemplated before,[4] the majority instead commandeers the doctrine's reasoning wholesale and takes great care to avoid any implication that a special needs doctrine now exists under article I, section 7. This is confusing at best—is there a special needs doctrine or not?—and disingenuous at worst. In *York*, 163 Wn.2d at 314, we said that no such doctrine existed in Washington, but that no longer appears to be true.

One reason the majority might be hesitant to formally adopt a special needs doctrine is because it takes us closer to Fourth Amendment jurisprudence despite our repeated affirmations that article I, section 7 provides broader protection than its federal counterpart. *See, e.g.*, *State v. Ladson*, 138 Wn.2d 343, 348-49, 979 P.2d 833 (1999). The majority's decision to emulate federal courts is especially peculiar here, given our promise to "offer heightened protection for bodily functions compared to the federal courts." *York*, 163 Wn.2d at 307. This difference stems from the text of article I, section 7, which provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."

---

[4] The lead opinion in *York*, signed by four justices, expressly declined to adopt a special needs exception or an equivalent strict scrutiny test under article I, section 7. 163 Wn.2d at 314. However, a concurring opinion, also signed by four justices, agreed that no special needs exception applied in that case but left the door open to adopting such an exception under article I, section 7. *Id.* at 329 ("The special needs exception is consistent with well-established common law principles governing warrantless searches and, thus, comports with article I, section 7." (Madsen, J., concurring)).

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

WASH. CONST. art. I, § 7. Article I, section 7 offers an affirmative promise of privacy, whereas searches under the Fourth Amendment need only be reasonable. U.S. CONST. amend. IV; *see, e.g., Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) ("the ultimate touchstone of the Fourth Amendment is 'reasonableness'" (quoting *Flippo v. West Virginia*, 528 U.S. 11, 13, 120 S. Ct. 7, 145 L. Ed. 2d 16 (1999))). The "reasonableness" standard at the heart of the Fourth Amendment provided the basis for the special needs doctrine in the first place. *See Skinner*, 489 U.S. at 618-20 (balancing governmental and privacy interests is appropriate to determine whether a search was reasonable). Therefore, the special needs doctrine—or the functional equivalent adopted by the majority— is inconsistent with article I, section 7 insofar as it is rooted in the Fourth Amendment's "reasonableness" standard:

> Thus, where the Fourth Amendment precludes only "unreasonable" searches and seizures without a warrant, article I, section 7 prohibits any disturbance of an individual's private affairs "without authority of law." [*York*, 163 Wn.2d at 305-06.] This language not only prohibits unreasonable searches, but also provides no quarter for ones which, in the context of the Fourth Amendment, would be deemed reasonable searches and thus constitutional.

*State v. Valdez*, 167 Wn.2d 761, 772, 224 P.3d 751 (2009). Even though the majority does not claim to do so, by adopting what is essentially a special needs analysis, it diminishes the privacy protections enshrined in article I, section 7 and brings us closer to Fourth Amendment jurisprudence. Alas, there is little need to adopt the

9

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

special needs doctrine now, given the majority has already provided a more than adequate doppelganger.

In dictum, the majority attempts to rein in its creation by assuring us the same reasoning would not apply to other probationary searches. Majority at 17. But this makes little sense—if a narrowly tailored search furthering a compelling government interest justifies the intrusion here, why would the same reasoning not justify other intrusions? So long as the State can meet this new standard, this court would be compelled to oblige under the majority's reasoning. It would be quite remarkable indeed if probationary urinalysis searches were such constitutional anomalies that this court needed to develop a legal framework so unique that it is disposed of and forgotten after one use.

Nevertheless, the majority attempts to distinguish urinalysis testing from other probationary searches by describing it as merely a "monitoring tool" used to ensure compliance with probationary conditions. Majority at 14. But this non sequitur is a semantic trick. All probationary searches are monitoring tools in the sense that they are intended to ensure compliance with probationary conditions. *See, e.g., Lucas*, 56 Wn. App. at 240-41 (The State has an interest in supervising probationers subject to probation conditions, and therefore probationers "should expect close scrutiny."); *see also Jardinez*, 184 Wn. App. at 523-24 (purpose of probationary searches is to determine whether probation violation occurred); *see also Griffin*, 483 U.S. at 883

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

State v. Olsen, No. 93315-4
(Fairhurst, C.J., dissenting)

("One important aspect of supervision is the monitoring of a probationer's compliance with the conditions of his probation. In order to ensure compliance with those conditions, a probation agent may need to search a probationer's home to check for violations.").

To support this distinction between a "monitoring tool" and other probationary searches, the majority cites three inapposite cases. *See State v. Riles*, 135 Wn.2d 326, 957 P.2d 655 (1998), *abrogated by State v. Sanchez Valencia*, 169 Wn.2d 782, 239 P.3d 1059 (2010); *State v. Combs*, 102 Wn. App. 949, 10 P.3d 1101 (2000); *State v. Williams*, 97 Wn. App. 257, 983 P.2d 687 (1999).

Neither *Riles* nor *Combs* involved urinalysis testing or an analogous search. *Riles* involved polygraph and plethysmograph testing as a condition of sexual deviancy therapy for individuals convicted of sex crimes. 135 Wn.2d at 337. This court has never suggested that polygraph or plethysmograph testing implicates privacy concerns in the way that urinalysis tests do. *See, e.g.*, *York*, 163 Wn.2d at 307; *see also* majority at 5-6. Further, *Riles* did not address the constitutionality of these alleged "monitoring tools" under either the Fourth Amendment or article I, section 7, it addressed only whether the Sentencing Reform Act of 1981, chapter 9.94A RCW, authorized these conditions. *Riles*, 135 Wn.2d at 340. Although *Riles* briefly mentions urinalysis testing in dictum, it did not hold that urinalysis testing is merely a "monitoring tool" that differs from other probationary searches. Like *Riles*,

11

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

*Combs* involved polygraph testing as a probation condition for a defendant convicted of child molestation. 102 Wn. App. at 952-53. It did not discuss the constitutionality of this condition, nor did it discuss urinalysis testing or any analogous search.

*Williams* involved urinalysis testing as a probationary condition, but it did not address the issue here—whether random, suspicionless urinalysis tests comply with article I, section 7. There, a probation officer ordered Jeremiah Williams to submit to a urinalysis test pursuant to a probation condition, and Williams failed to comply. *Williams*, 97 Wn. App. 260-61. After a probation hearing, the commissioner revoked Williams' probation and sentenced him to 180 days of confinement. *Id.* Williams appealed, arguing that the alcohol and drug conditions were not authorized by statute and that the commissioner unlawfully delegated judicial authority to the probation department. *Id.* at 262. He did not challenge the urinalysis test on a constitutional basis.

Nor could he. The facts in *Williams* unambiguously demonstrate that the probation officer had reasonable suspicion to require a urinalysis test. Before the probation officer ordered the test, Williams actually admitted that he had been using marijuana. *Id.* at 261. It was this admission that motivated the probation officer to order the test. *Id.* This admission is more than sufficient to establish reasonable suspicion to conduct a probationary search. *See, e.g., Parris*, 163 Wn. App. at 119 (discussing reasonable suspicion standard). If anything, *Williams* demonstrates how

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

probationary urinalysis tests should work. It supports the proposition that once a probation officer requires a probationer to submit to a search given reasonable suspicion that the probationer has violated a validly imposed probation condition, the probationer must comply. *Williams* in no way supports the majority's theory that urinalysis testing implicates only minimal privacy interests because it is merely a monitoring tool. Frankly, none of the authority the majority cites suggests that monitoring tools are subject to different analysis under article I, section 7.

What the majority means to say (and eventually does) is that a urinalysis test is less invasive than other searches—such as a search of one's home, vehicle, or electronic devices—because those searches might reveal more sensitive information. Majority at 17-18. This reasoning is at least consistent with the majority's test. Presumably, a less invasive search is more narrowly tailored and thus more likely to withstand constitutional scrutiny. But the only question relevant to this analysis is the nature of the privacy interest intruded and the degree of the invasion. The contrived distinction between a monitoring tool and other probationary searches is irrelevant and unhelpful in addressing that question. After all, a search by any other name still implicates article I, section 7.

And even accepting the majority's test, it is questionable whether random, suspicionless urinalysis testing is narrowly tailored enough to justify disposing of the reasonable suspicion requirement. The majority insists urinalysis testing is less

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

invasive than other searches because it does not expose "a large amount of private information." Majority at 18. But this fails to recognize the full nature of the privacy interest at stake. It is not merely the information obtained but the method of urinalysis testing that invades an individual's privacy. The majority recognizes this concern when it concludes that probationers have a privacy interest in their urine but conveniently forgets it when it determines urinalysis testing is not very invasive. Majority at 6, 17-18; *see also York*, 163 Wn.2d at 334 ("'[i]t is difficult to imagine an affair more private than the passing of urine.'" (alteration in original) (quoting *Robinson v. City of Seattle*, 102 Wn. App. 795, 818, 10 P.3d 452 (2000))); *see also Skinner*, 489 U.S. at 617 ("'There are few activities more personal or private than the passing of urine.'" (quoting *Von Raab*, 489 U.S. at 175)). A probation officer may be able to learn more about probationers' lives by searching their cars rather than by observing their exposed genitalia while they urinate, but that does not mean the latter is any less invasive.

Further, the majority overstates the impracticality of the reasonable suspicion requirement. In fact, the reasonable suspicion requirement comports with the majority's strict scrutiny test by providing a less drastic means for the State to achieve the same goals. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973) (State action is narrowly tailored when

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

"it has selected the 'less drastic means' for effectuating its objectives." (quoting

*Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972))).

Reasonable suspicion is a low burden. A trained probation officer could

observe visible signs of impairment or other aspects of a probationer's demeanor

that indicate substance use. A probation officer may observe evidence of substance

use through routine visits to probationers or unannounced[5] check-ins. A probation

officer could receive tips or interview witnesses to determine whether a probation

violation has occurred.

A probation officer may even discover facts creating an inference that a

violation has occurred through regular interaction with the probationer. For

example, in *United States v. Duff*, 831 F.2d 176 (9th Cir. 1987), the Ninth Circuit

noted that a urinalysis test of a probationer must be supported by reasonable

suspicion.[6] *Id.* at 179. The court noted that reasonable suspicion existed given the

probationer's behavior:

---

[5] The majority suggests that reasonable suspicion would be impractical in part because urinalysis tests must be unannounced in order to serve the State's rehabilitative interests. Majority at 16-17. But whether a search is announced or not has nothing to do with the degree of individualized suspicion supporting that search. Indeed, law enforcement officers do not announce every search they perform before they begin, even when those searches are supported with a warrant. In other words, reasonable suspicion would provide probation officers the authority to conduct a urinalysis test. Whether they give the probationer advance notice as to when the test will occur is within their discretion.

[6] I note that some federal courts, despite employing the special needs doctrine, have held that urinalysis testing of probationers must be supported by a reasonable suspicion that a probation violation occurred. *See, e.g., United States v. Giannetta*, 909 F.2d 571, 576 (1st Cir. 1990) (urinalysis test is justified "so long as the decision to search was in fact narrowly and properly

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> The probation officer had reasonable suspicion that Duff might be using drugs. Duff was not gainfully employed, he had allegedly filled out false prescriptions for Percodan, he allegedly was involved with a group that burglarized his house, and he consistently failed to meet with or cooperate with his probation officer.

*Id.* As in *Duff*, a trained probation officer may be able to learn certain facts that indicate relapse into substance use. For example, persistent unemployment, fraternization with known enablers, consistent failure to cooperate, along with other factors, may give rise to an inference that the probationer is at risk of using alcohol or a controlled substance. There may be other facts, short of direct observation, that rehabilitative professionals consider relevant in determining whether an individual is using substances. These facts would not be difficult to obtain and would likely satisfy the reasonable suspicion standard. Contrary to the majority's assertion, the reasonable suspicion standard would not prevent the State from effectuating its goals, and it arguably comports with the majority's strict scrutiny analysis.

Nevertheless, the majority rejects the reasonable suspicion standard. But it assures us that, regardless, urinalysis tests must be conducted "in a []reasonable manner," and that they cannot be "exploratory." Majority at 20. But these promises ring hollow. How can a court evaluate the reasonableness of a search if there is not

---

made on the basis of reasonable suspicion"); *see also Duff*, 831 F.2d at 179. These cases reveal the irony in the majority's opinion. Despite acknowledging that the Washington Constitution provides "increased protection" for the collection and testing of bodily fluids when compared to federal courts, majority at 3, the ultimate result actually provides less.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

even a minimal requirement of individualized suspicion to justify it? Typically, the reasonable suspicion standard protects probationers from unreasonable, exploratory, or otherwise arbitrary or capricious searches. *See Simms*, 10 Wn. App. at 84. By removing the reasonable suspicion standard, the majority's opinion can no longer assure the same protection because it essentially makes probationary urinalysis tests unreviewable.

In conclusion, the majority's opinion adopts a strict scrutiny test that is the functional equivalent of the federal special needs doctrine. This expansion of our jurisprudence diminishes the differences between the Fourth Amendment and article I, section 7. Further, this decision confuses the standard by which we evaluate probationary searches and may result in consequences beyond the probationary context. I dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*State v. Olsen*, No. 93315-4
(Fairhurst, C.J., dissenting)

Fairhurst, C.J.